MSA NO. 20080116

City Link

VoIP360

# MASTER SERVICES AGREEMENT

This Master Services Agreement ("Master Services Agreement" or "MSA") is made and entered into between VoIP360, Inc., a Delaware corporation ("VoIP360"), and CityLink Fiber Holdings, Inc, a New Mexico corporation, ("Customer"), effective as of the last date below (the "Effective Date"). Customer and VoIP360 agree as follows:

Services. Customer may purchase certain communication, information and/or data services from VoIP360 ("Services") pursuant to this Agreement (defined below). Each Service provided pursuant to this Agreement shall be the subject of a service order in a written, electronic or other format mutually agreed to by VoIP360 and Customer ("Service Order"). Provided that VoIP360 accepts the applicable Service Order, VoIP360 agrees to provide and Customer agrees to pay for and receive from VoIP360 each Service pursuant to the terms of this Agreement. VoIP360 shall have no obligation to accept a Service Order or to provide a Service without a Service Order. In the event VoIP360 provides Services to Customer without a written Service Order and Customer accepts or uses such Services, the Parties agree that the provision of such Services shall be governed by this Agreement unless such Services are the subject of a separate written agreement between the Parties in which event such separate agreement shall control.

Entire Agreement. This Master Services Agreement includes the Master Terms and Conditions, applicable Service Schedules (indicated by checking all that apply), and any Service Orders, Service Level Agreements, Acceptable Use Policies or other documents attached thereto or incorporated by reference. Collectively, these documents shall constitute and be referred to as the "Agreement". Please check all Service Schedules to be included:

x VoIP360 Services - (ver 1.8.2)
☐ Private Line
☐ IP Transit
☐ Dark Fiber Lease
☐ Collocation
☐ Other ____________________

This Agreement is the entire agreement between Customer, its Affiliates and VoIP360 regarding each Service provided by VoIP360 to Customer and supersedes all other agreements or understandings expressed or implied between the Parties related to each Service except to the extent such Services are the subject of a separately executed agreement between the Parties in which event such separate agreement shall control. In the event of any conflict between the documents comprising this Agreement, precedence shall be given to the documents in the following order: (i) this MSA; (ii) the applicable Service Schedule; (iii) the Master Terms and Conditions; (iv) the Service Level Agreement and (v) the applicable Service Orders. The Parties have executed this Agreement as of the Effective Date and as though the following signatures were placed at the end of the attached Service Schedule(s).

CityLink Fiber Holdings, Inc

By: [signature]

Name/Title: John Brownlow, President

Date: 12-Feb-09

FCC Filer 499 ID No. Applied see Attached 827575

Notice Address:

CityLink Fiber Holdings, Inc
505 Marquette Ave, NW Suite LL-110A
Albuquerque, NM 87102

VoIP360, Inc ("VoIP360")

By: [signature]

Name/Title: Liza L. Dennehy / VP Operations

Date: 2/23/2009

Notice Address

VoIP360, Inc.
867 Coal Creek Circle, Suite 160
Louisville, CO 80027
Attn. Contracts Management
Fax: (303) 854-5100

Additional Copies (fax only) To:
Attn: Butte Office / Customer Service
Fax: (406) 496-6585
Attn: Seattle Office / Legal
Fax: (866) 728-7703

EXHIBIT "1"

MSA NO. 20080116

City Link

## MASTER TERMS AND CONDITIONS

1. Notices. All notices and other communications required or permitted under this Agreement shall be in writing and shall be given by hand delivery, overnight mail, first class mail, facsimile (with original to follow the same day) or email (with signed hard copy to follow by mail the same day) to each Party at its Notice Address Any such notice or other communication shall be deemed effective when actually received or refused Either Party may, by similar notice given, change the Notice Address to which future notices or other communications shall be sent

2 Definitions As used in this Agreement, the capitalized terms listed in this Article 2 and derivatives thereof shall have the meanings respectively ascribed to them in this Article 2. Certain other capitalized terms shall have the meanings ascribed to them elsewhere in this Agreement

"VoIP360 System" means that certain fiber optic communications network, including optronics and other facilities that VoIP360 or its Affiliates holds rights in, has constructed, or is constructing

"Affiliate" means, with respect to any Entity, any other Entity, who directly or indirectly controls, is controlled by, or is under common control with that Entity As used in this definition, "control" means the possession, directly or indirectly, of the power to vote 50.1% or more of the securities (on a fully diluted basis) having ordinary power for the election of directors, managing general partners or managing members.

"Dollars" or "$" means U.S. Dollars

"Force Majeure Event" means any cause, which is unforeseeable by the affected Party or beyond the reasonable control of the affected Party.

"Interest Rate" means the lower of (i) the highest rate permitted by applicable law, or (ii) one percent (1.0%) per month which equals 12.0% per annum

"Maintenance Window" means 12:00 midnight to 6:00 a.m. (local time) and certain scheduled weekends, as required.

"Party" means each of VoIP360 and Customer and "Parties" means VoIP360 and Customer.

3. Billing and Payment

3.1 Billing. In consideration of the provision of each Service hereunder by VoIP360 to Customer, Customer agrees to pay VoIP360 the monthly fees and nonrecurring fees set forth (a) in each Service Order and/or Exhibit A (Price List) to the Service Schedule(s), or (b) if the fees are not described in a Service Order or Exhibit A, then VoIP360 standard list prices as of the date the Services are provided to Customer (the "Fees"). The first invoice with respect to each Service shall contain the Fees for the first partial calendar month of Service (or portion thereof) and the next full month of Service and any applicable non-recurring charges. Thereafter, the Fees will be invoiced monthly in advance, except Fees that are incurred on a per-use basis (i.e., long distance, operator service, and directory assistance), which shall be billed in arrears. The Fees for each Service shall be due and payable within thirty (30) days from the date of invoice, except as otherwise expressly set forth in a Service Order or Service Schedule.

3.2 Payment of Invoices. All payments made by Customer hereunder shall be made by company check payable to VoIP360 or by wire transfer of immediately available funds pursuant to wire instructions provided by VoIP360 and shall be considered "paid" when available to VoIP360 Except as otherwise provided in this Agreement, all payments made by Customer shall be nonrefundable

3.3 Disputing Invoices. If Customer reasonably disputes any portion of a VoIP360' invoice, Customer must pay the undisputed portion of the invoice and submit written notice of the claim (with sufficient detail of the nature of the claim, the amount and invoices in dispute and information necessary to identify the affected Service(s) for the disputed amount) prior to the date payment is due. All claims for a credit or refund must be submitted to VoIP360 in writing within thirty (30) days from the date of the invoice for those Services. Customer waives the right to dispute any charges not disputed within such thirty (30) day period. In the event that the dispute is resolved against Customer, Customer shall pay such amounts plus interest at the rate referenced in Section 2.

3.4 Credit Approval and Deposits. In addition to what is set forth in the Service Schedule, Exhibit A or a Service Order, in the event that Customer fails to make payment to VoIP360 of any undisputed amount when due on two (2) occasions within any twelve (12) month period, VoIP360 may require Customer to make a security deposit of one (1) month's estimated charges for Service due upon VoIP360' written request. When Service to Customer is terminated, any remaining amount of the deposit will be returned to Customer within ten (10) days Any deposit paid by Customer pursuant to this Section 3 4 will be held by VoIP360 in accordance with the applicable law governing such deposit. VoIP360 may condition acceptance of any Service Order at any time on prepayment of Fees or a Deposit with respect to such Service Order.

3.5 Taxes and Fees. Except for taxes based on VoIP360' net income, Customer will be responsible for all taxes that arise in any jurisdiction, including, without limitation, value added, consumption, sales, use, gross receipts, excise, access, bypass, franchise or other taxes, fees, duties, charges or surcharges, however designated, imposed on, incident to, or based upon the provision, sale or use of the Service (collectively "Applicable Taxes"). All charges for Services are exclusive of Applicable Taxes. If Customer is entitled to an exemption from any Applicable Taxes for a particular Service, Customer is responsible for presenting VoIP360 with a valid exemption certificate (in a form reasonably acceptable to VoIP360) VoIP360 will give effect to any such exemption certificate on a prospective basis from and after VoIP360' receipt of such exemption certificate. VoIP360 shall have no obligation or liability for any taxes paid prior to receipt of certificate and it shall be Customer's sole responsibility to obtain a refund, if any, of taxes paid prior to receipt of such certificate.

3.6 Customer's Rights of Set-Off. Customer's obligation to pay any Fees, Applicable Taxes or amounts due under this Agreement shall not be subject to any rights of set-off, counterclaim, deduction, defense or other right which Customer may have against VoIP360 or any other party.

4 Provisioning, Delivery and Acceptance. Provisioning, Delivery and Acceptance terms and conditions are described in the Service Schedule(s) specific to each Service. Notwithstanding anything to the contrary contained in this Agreement, VoIP360 may procure any portion of a Service or infrastructure necessary to provide a Service from Affiliates or third parties (whether under a lease, sublease or otherwise) and deliver the same or a portion thereof to Customer. VoIP360 may also substitute, change, convert or reconfigure the communications equipment and facilities used in providing a Service as long as the quality of such Service is not impaired or diminished.

5 Term.

5.1 Term of the Agreement. This Agreement shall become effective on the Effective Date and shall continue for a period of three years thereafter unless otherwise set forth in Exhibit A ("Agreement Term"), unless earlier terminated as provided herein. At the end of the initial Agreement Term, the Agreement Term shall automatically renew on a month-to-month basis until terminated by either party upon thirty (30) days' prior written notice to the other party.

5.2 Service Term. The term with respect to each Service shall begin on the Acceptance Date and shall extend for a period of months thereafter as set forth in the applicable Service Order (the "Service Term"). Except as otherwise set forth herein, VoIP360 shall deliver the Service for the entire duration of the Service Term and Customer shall pay all charges for delivery thereof through the end of the Service Term. To the extent the Service Term for any Service extends beyond the Agreement Term, this Agreement shall remain in full force and effect for such Service until expiration or termination of such Service Term. At the expiration of each Service Term, VoIP360 may, at its option, continue to provide Customer the Service set forth in the applicable Service Order pursuant to the terms of such Service Order on a month-to-month basis and Customer shall continue to pay the applicable fees, unless Customer notifies VoIP360 at least sixty (60) days prior to the expiration of the Service Term of Customer's desire to terminate the Service. If VoIP360 continues to provide the Service on a month-to-month basis, either Party may terminate the Service by giving the other Party notice of termination, including a reference to the applicable circuit numbers. The Service shall then terminate at the end of the next month following the date of notice. Upon final termination of Service, Customer's right to use such Service shall cease.

5.3 Continuing Obligations. Upon the expiration of the Term, VoIP360 shall owe Customer no further duties, obligations or consideration. Termination of this Agreement shall not affect the rights or obligations of either Party that have arisen before the date of termination or expiration. The expiration or termination of the Agreement shall not relieve Customer from any liabilities arising prior to such termination.

6. Use of a Service. Customer represents, warrants and covenants that during the Term and/or each Service Term (a) it shall use each Service in compliance with and subject to all applicable government codes, ordinances, laws, rules and regulations and the applicable VoIP360' Acceptable Use Policy ("AUP"), incorporated herein by this reference, and which may, from time to time be modified as communicated to Customer or as set forth on VoIP360 website, and will require its customers to do the same, (b) it shall secure, prior to the Acceptance Date with respect to each Service, and maintain in full force and effect during the applicable Service Term, any and all necessary approvals, consents, rights of way, permits, franchises, licenses or similar approvals from all governmental and other authorities which are necessary or required to be obtained by Customer for the use and operation of each Service by Customer, (c) it shall not use its systems or any Service in a way that interferes in any way with or adversely affects the use of the VoIP360 System or any other Entity using the VoIP360 System or any communications and/or data services thereon, and it shall not physically access in any manner the VoIP360 System or any components thereof, and (d) it is certified to the extent required by the proper regulatory agencies to provide intrastate, interstate, international and other services in those jurisdictions where such services are to be provided by Customer.

7. Indemnification

7.1 Each Party hereby agrees to indemnify, defend, protect and hold harmless the other Party, its employees, agents, officers and directors (the "Indemnified Persons"), from and against, and assumes liability for all suits, actions, damages or claims of any character brought against the Indemnified Persons because of any personal injuries or tangible property damage received or sustained by any persons or property which in whole or in part arise on account of the negligent acts or omissions or willful misconduct of the indemnifying Party in the performance of or related to the indemnifying Party's duties or obligations under this Agreement provided that VoIP360 shall have no obligations under this Article 7 with respect to any Service failure.

7.2 Customer agrees to indemnify, defend, protect and hold harmless VoIP360 Indemnified Persons from and against, and assumes liability for all suits, actions, damages or claims of any character brought against VoIP360 for either or both of the following: (i) by any third parties that use all or part of any Service provided to Customer and which in whole or in part arise or are related to this Agreement, Service failures or the Services provided hereunder; and/or (ii) due to any failure of Customer to comply with its obligations described in Article 6 and Section 15.11.

7.3 The Parties hereby waive and release all claims and causes of action against each other, their Affiliates, successors or assigns, for any damage or loss of any kind, which they, their Affiliates, successors or assigns may hereafter have under the provisions of Title 35 of the United States Code or under any related indemnity or similar theory of recovery, arising from the delivery, use, sale or resale of the Services. For clarity, the Parties recognize that the foregoing waiver is not intended to affect any of the indemnification obligations of the Parties specifically described in Sections 7.1 and 7.2. This Section 7.3 shall be construed as a covenant not to sue and shall be limited in scope as hereinbefore described. The Parties recognize and hereby acknowledge that this covenant includes future claims which have not yet accrued, but

the Parties hereby acknowledge and state that they understand the nature and scope of the claims which are expressly waived and released and for which they hereby covenant not to make a claim of any kind against the other Party, its Affiliates, successors or assigns. The Parties further state and acknowledge that the Parties' bargaining power in the negotiation of this agreement is equal and this covenant not to sue does not unduly impinge upon any overriding public policy. As used in this Section 7.3, "infringement" shall mean any violation of 35 U.S.C. Section 271

7.4 Each Party hereby represents that it has not been sued for, or threatened with litigation for, infringement of any patent that relates to the Services or VOIP technology. Each Party further represents that it has not been approached by any third party patent owners with offers to license any patents (including offers for covenants not to sue for infringement of specified patents) relating to the Services or VOIP technology for which it has not received a license prior to the Effective Date

7.5 Each Party agrees to indemnify, defend, protect and hold harmless the other Party and its Indemnified Persons from and against, and assumes liability for all suits, actions, damages or claims of any character brought against the other Party and its Indemnified Persons due to any failure of Indemnifying Party to comply with its obligations described in Section 7.3 and Section 7.4.

7.6 In no event shall either Party have the duty to defend, indemnify, and hold harmless hereunder unless and until it receives prompt notice of the claim at issue and the opportunity to control the defense of it The foregoing notwithstanding, in no event may the indemnifying party admit liability on behalf of the other Party, compel the other Party to admit liability, or agree to the payment of any unindemnified amounts.

7.7 Notwithstanding the termination of this Agreement for any reason, the provisions in this Article 7 shall survive such termination for a period of 1 year

8 Service Levels; Limitation of Liability

8.1 Service Levels. To the extent expressly set forth in the Service Level Agreement ("SLA") applicable to Customer as of the date VoIP360 provides a Service, VoIP360 will provide Customer a credit or other remedy for less than objective availability of a Service, unless such failure is caused by a Force Majeure Event or by Customer or its Affiliates, agents or invitees. VoIP360 makes no representation or warranty that the Service will be available at all times and a temporary failure of Service shall not constitute a breach of this Agreement.
NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THE RELIEF SET FORTH IN THE SLA SHALL BE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY WITH RESPECT TO THE FAILURE OR NON-PERFORMANCE OF A SERVICE

8.2 No Special Damages. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES FOR LOST PROFITS, REVENUES, GOODWILL, ANTICIPATED SAVINGS, DATA OR COST OF PURCHASING REPLACEMENT SERVICES, OR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, COSTS OR LIABILITIES ARISING OUT OF THE PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT.

8.3 Disclaimer of Warranties. EXCEPT AS EXPRESSLY STATED HEREIN OR IN THE APPLICABLE SLA, VOIP360 MAKES NO WARRANTY, REPRESENTATION OR INDEMNITY, EXPRESS OR IMPLIED, WITH RESPECT TO THE DELIVERY OR PERFORMANCE OF ANY SERVICE, THE VOIP360 SYSTEM, OR ANY WORK PERFORMED UNDER THIS AGREEMENT INCLUDING ANY AND ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE OR USE OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE, AND ALL SUCH WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. THE WARRANTIES SET FORTH IN THE APPLICABLE SLA CONSTITUTE THE ONLY WARRANTIES MADE BY VOIP360 TO CUSTOMER WITH RESPECT TO THIS AGREEMENT AND ARE MADE IN LIEU OF ALL OTHER WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED.

8.4 Statute of Limitations The Parties expressly agree that no claim for losses or damages whatsoever in connection with this Agreement, including indemnification under the provisions of Article 7, shall be made more than two (2) years after the date that the event giving rise to such claim is known or reasonably should have been known to the Party making such claim.

8.5 Grantor Indemnity. Notwithstanding the foregoing provisions of this Article 8, to the extent VoIP360 is required under the terms and provisions of any easement, right-of-way, lease, indefeasible right of use agreement or other agreement relating to the provisioning of any Service hereunder ("Use Agreements"), to indemnify the grantor or provider thereof from and against any and all claims, demands, suits, judgments, liabilities, losses or expenses arising out of or related to such Use Agreements, regardless of the cause, Customer hereby releases, and waives any claims against such grantor or provider from the same.

8.6 Limitation of Liability. Notwithstanding any provision of this Agreement to the contrary, VoIP360' maximum cumulative liability to Customer (if any), in connection with this Agreement shall be limited, in the aggregate, to the aggregate amount of Fees that have been paid by Customer to VoIP360 in the preceding six (6) months with respect to the Service on which the claim is based.

9. Insurance. Upon the first Acceptance Date of a Service and throughout the Term, each Party shall procure and maintain in force, at its own expense, insurance coverage in amounts that a reasonably prudent business Entity would maintain considering the obligations of the Parties hereunder but in no event less than coverage of the following types and limits: (a) workers' compensation as required by applicable law; (b) contingent employer's liability with minimum limits of $1,000,000; (c) general liability with minimum limits of $2,000,000; and (d)

automobile liability with minimum limits of $2,000,000. Such required insurance shall be obtained through insurers reasonably acceptable to the other Party and licensed to conduct business in the jurisdiction Each Party shall obtain from the insurance companies providing the coverage required by this Agreement, the permission of such insurers to allow such Party to waive all rights of subrogation and each Party does hereby waive all such subrogation rights

10 Confidentiality.

10.1 Non-Disclosure. This Agreement and all documents, data, information, maps and other materials, which are disclosed by one Party to the other Party in fulfilling the provisions and intent of this Agreement, are and shall be confidential (the "Confidential Information"). Neither Party shall divulge or otherwise disclose the Confidential Information to any third party without the prior written consent of the other Party, except that either Party may make disclosure on a need-to-know basis to those employees required for the implementation or performance of this Agreement. In addition, either Party may make disclosure as required by a court order or as otherwise required by law or in the performance of a Party's obligations (or those of its Affiliates) as a public company. If either Party is required by law or similar process to disclose any Confidential Information, it will provide the other Party with prompt prior written notice of such request or requirement so that such Party may seek an appropriate protective order and/or waive compliance with this Article 10. The Party whose consent to disclose information is requested shall respond to such request, in writing, within five (5) working days of the request by either authorizing the disclosure or advising of its election to seek a protective order, or if such Party fails to respond within the prescribed period the disclosure shall be deemed approved. This provision shall supersede any separately executed non-disclosure agreement ("NDA") between the Parties with respect to Confidential Information as defined above, but shall otherwise not affect either Party's obligations pursuant to any such NDA with respect to any other confidential information.

10.2 Customer Proprietary Network Information ("CPNI"). Both Parties agree that any CPNI exchanged between them in the performance of this Agreement shall be kept confidential and used strictly in accordance with applicable law

11 Default

11.1 Event of Default. A default shall occur under this Agreement if: (a) in the case of a failure to pay any amount when due under this Agreement or any Service Order, Customer fails to pay such amount within five (5) days, or such longer period as required by law, after notice specifying such breach; or (b) in the case of any other material breach of this Agreement, a Party fails to cure such breach within thirty (30) days after notice specifying such breach, provided that if the breach is of a nature that cannot be cured within thirty (30) days, a default shall not have occurred so long as such Party has commenced to cure within said time period and thereafter diligently pursues such cure to completion. Notwithstanding the foregoing, a material breach by VoIP360 in respect of a Service or Service Order, including without limitation, failure to provide a Service, shall not be considered a material breach of this Agreement and shall not affect any other Service Order or this Agreement generally and Customer's sole and exclusive remedy for such breach is described in the applicable SLA.

11.2 Remedies. In the event of any default hereunder, other than as related to Section 8.1, the non-defaulting Party may avail itself of one or more of the following remedies: (a) take such actions as it determines, in its sole discretion, necessary to correct the default; (b) terminate this Agreement, (c) pursue any legal remedies it may have under applicable law or principles of equity, including specific performance, (d) terminate or suspend any and all of its obligations in respect of this Agreement, in whole or in part (including without limitation, suspension or termination of all or certain Services), and in the event of default by Customer apply any and all amounts previously paid by Customer hereunder toward the payment of any other amounts then or thereafter payable by Customer hereunder and (e) pursue any remedies set forth in the applicable Service Schedule(s) Customer shall be responsible for all reasonable out-of-pocket costs and expenses (including attorneys fees and collection agency fees and costs) incurred by VoIP360 to collect Fees due VoIP360 that are not timely paid by Customer.

11.3 Suspension of Service. If VoIP360 has a reasonable suspicion that Customer is in violation of any applicable laws, statutes, ordinances, codes, decisions or other legal requirements with respect to a Service, or if Customer's use of a Service interferes with or impairs the VoIP360 System, is fraudulent, VoIP360 may block Customer's signals, suspend or terminate the Service. VoIP360 will immediately notify Customer when a blockage, suspension or termination occurs and the Parties shall work diligently towards restoration of the affected Service. Such blockage, suspension or termination shall not be included in any service level calculation set forth in this Agreement or the SLA. In addition, for Services subject to VoIP360' AUP, if VoIP360 has a reasonable suspicion that Customer is in violation of such AUP, VoIP360 may issue a warning, suspend or terminate Service or otherwise take such action as is described in such AUP.

12 Force Majeure Events. Neither Party shall be in default under this Agreement if and to the extent that any failure or delay in such Party's performance of one or more of its obligations hereunder is caused by a Force Majeure Event, and such Party's performance of such obligation or obligations shall be excused and extended for and during the entire duration of any such Force Majeure Event. Failure to pay any amount due shall not be considered, or be excused by, a Force Majeure Event. The Party claiming relief under this Article 12 shall notify the other in writing of the existence of the event relied on and the cessation or termination of said event, and the Party claiming relief shall exercise reasonable commercial efforts to minimize the time of any such delay

13. Assignment and Transfer Restrictions / Resale. Customer shall not transfer or assign all or any part of its interest under this Agreement, or delegate any duties, burdens, or obligations arising hereunder, without 360network's written consent, which consent will not be unreasonably withheld. A transfer or assignment in violation of this Article 13 shall constitute a material breach of this

Agreement and shall be null and void from its inception. If any such consent is given, the assignor nevertheless shall remain jointly and severally liable for all obligations under this Agreement. Customer may resell the Service to third parties provided that Customer agrees to indemnify, defend and hold VoIP360 harmless from claims made against VoIP360 by such third parties in accordance with Article 7

14 Representations. Each Party represents and warrants to the other that: (a) the representing Party has full right and authority to enter into this Agreement and that by entering into this Agreement, the representing Party is not in violation of its charter or bylaws, or any law, regulation or agreement by which it is bound or to which it is subject; (b) the execution, delivery and performance of this Agreement by such Party has been duly authorized by all requisite corporate action, and the signatories for such Party hereto are authorized to sign this Agreement; (c) the representing party is a business entity duly organized and validly existing and in good standing under the laws of its jurisdiction of organization; and (d) there are no actions, suits or proceedings pending or threatened against the representing Party before any court or administrative agency that would materially impair such Party's performance under this Agreement.

15. General

15.1 Waiver. The failure of either Party to enforce any of the provisions of this Agreement, or the waiver thereof in any instance, shall not be construed as a general waiver or relinquishment on its part of any such provision, but the same shall nevertheless be and remain in full force and effect

15.2 Governing Law. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to its principles of conflicts of laws. The application of the United Nations Convention on Contracts for the International Sale of Goods to this Agreement is hereby strictly excluded. Venue for any dispute arising under this Agreement shall be Denver, Colorado.

15.3 Rules of Construction. The captions or headings in this Agreement are strictly for convenience and shall not be considered in interpreting this Agreement or as amplifying or limiting any of its content. Unless expressly defined herein, words having well known technical or trade meanings shall be so construed. All listing of items shall not be taken to be exclusive, but shall include other items, whether similar or dissimilar to those listed, as the context reasonably requires. Except as set forth to the contrary herein, a Party's right or remedy shall be cumulative and without prejudice to any other right or remedy, whether contained herein or not. This Agreement has been fully negotiated between and jointly drafted by the Parties. This Agreement does not provide and is not intended to provide any third parties, other than certain Affiliates of the Parties, with any remedy, claim, reimbursement, cause of action or any other right. All actions, activities, consents, approvals and other undertakings of the Parties shall be performed in a reasonable and timely manner, it being expressly acknowledged and understood that time is of the essence in the performance of obligations required to be performed by a date expressly specified herein.

15.4 Modification. This Agreement may only be modified or supplemented by an instrument in writing executed by authorized representatives of each Party and specifically stating that the Parties intend to modify or supplement this Agreement.

15.5 No Personal Liability. Each action or claim against a Party arising under or relating to this Agreement shall be made only against such Party as a business entity, and any liability relating thereto shall be enforceable only against the business entity assets of such Party.

15.6 Relationship of the Parties. The relationship between Customer and VoIP360 shall not be that of partners, agents, or joint venturers for one another, and nothing contained in this Agreement shall be deemed to constitute a partnership or agency agreement between them for any purposes, including, but not limited to tax purposes. Customer and VoIP360, in performing any of their obligations hereunder, shall be independent contractors or independent parties and shall discharge their contractual obligations at their own risk subject, however, to the terms and conditions hereof.

15.7 Severability. If any term, covenant or condition contained in this Agreement or any Service Order is, to any extent, held invalid or unenforceable in any respect under the laws governing this Agreement, the remainder of this Agreement shall not be affected thereby, and each term, covenant or condition of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

15.8 Facsimile and Counterparts. This Agreement may be executed by facsimile or in one or more counterparts, all of which taken together shall constitute one and the same instrument. If executed copies are initially delivered by facsimile, each Party agrees to supply an original counterpart copy to the other upon request.

15.9 Title to Equipment; Infrastructure. This Agreement shall not in any way convey title to or any interest in the infrastructure, systems, equipment, facilities or other property of VoIP360 (or its Affiliates) utilized in connection with the provision of any Service.

15.10 Performance. Customer expressly agrees and acknowledges that, notwithstanding that VoIP360 shall be liable for all of the obligations ascribed to it under this Agreement, any Affiliate of VoIP360 may perform such obligations.

15.11 Subject to Laws. Customer agrees to comply with, all applicable federal, state, and local laws, and regulations, rulings and orders of governmental agencies, including, but not limited to, the *Communications Act of 1934* as amended by the *Telecommunications Act of 1996*, as amended (USA), the Rules and Regulations of the Federal Communications Commission ("FCC")and state public utility or service commissions ("PSC"). VoIP360 and Customer also agree to take all steps necessary to obtain and continue in effect any required certification, permit, license, approval or authorization of the FCC and PSC or any governmental body. If VoIP360 cannot obtain all necessary federal, state, local or other governmental authority to provide

Services, VoIP360 shall promptly give written notice thereof to Customer and such notice shall constitute termination of the applicable Service Order without liability of either Party.

15.12 Intellectual Property. Nothing herein shall be construed as granting any right or license under any copyrights, trademarks, service marks, trade names, inventions, or patents now or hereafter owned or controlled by either Party. The marks used in this Agreement are either registered service marks or service marks of VoIP360, its Affiliates or third parties in the United States. Neither party shall issue any press release relating to any contractual relationship between VoIP360 and Customer, except as may be required by law or agreed between the parties in writing.

15.13 Change of Law. In the event of any change in applicable law, regulation, decision, rule or order that imposes material new obligations or liabilities on VoIP360 (including, without limitation, a material increase in the cost of providing the Service) ("New Obligations"), 360 and Customer will negotiate regarding additional terms to address such New Obligations (including without limitation, the rates to be charged to Customer to reflect an increase in cost) and, in the event that the parties are unable to reach agreement respecting such new terms within thirty (30) days after 360's delivery of written notice requesting renegotiation, then (a) 360 may pass such new terms through to Customer, and (b) if 360 elects to pass such new terms through to Customer, Customer may terminate the affected Service without termination liability by delivering written notice of termination no later than forty five (45) days after the effective date of the new terms.

15.14 Customer Affiliates. Customer's Affiliates may purchase Services pursuant to this Agreement, provided an authorized representative of such Affiliate executes an undertaking in favor of VoIP360 agreeing to be jointly and severally bound by the terms of this Agreement. Customer shall be the Customer of record for all Services and, together with any ordering Affiliate, shall be jointly and severally liable for all obligations pursuant to this Agreement, notwithstanding that the invoice for a Service may be sent to the Customer Affiliate at an address designated by such Customer Affiliate. If an Affiliate of Customer orders a Service pursuant to this Agreement, the ordering Affiliate shall be referred to herein collectively with Customer as "Customer".

**[END OF DOCUMENT]**

**Service Schedule**
**(VoIP360 Services)**

1 Definitions. Capitalized terms shall have the meanings ascribed to them below or elsewhere in this Agreement.

1.1 "Call Time" means the interval that elapses between (i) the moment when the reply condition (answer signal from the called party) is detected at the point where the recording of the call duration takes place, and (ii) the moment when the disconnect signal is detected from either direction, rounded to the nearest second.

1.2 "CCS" or "Concurrent Call Session" means the active use of the corresponding capacity of one voice-frequency-equivalent channel.

1.3 "CDR" means call detail record

1.4 "CNAM" means caller identification with name.

1.5 "Enhanced OCN" means those certain OCNs identified on the VoIP360 Website as an "Enhanced OCN".

1.6 "JIP" means jurisdiction information parameter.

1.7 "LCA" means Local Calling Area and is a uniquely defined mandatory geographical local calling area used by the incumbent local exchange carrier serving that area and approved or permitted to take effect by the appropriate regulatory authorities that includes one or more Rate Centers. The Parties agree to utilize Telcordia LCADS (Local Calling Area Data Source) to determine which calls are within an LCA and any disputes that arise from VoIP360 terminating a local call shall be governed by the information provided in Telcordia LCADS.

1.8 "LNP" means local number portability.

1.9 "Local Call" means a call that originates and terminates within the same LCA.

1.10 "Local OCN" means those certain OCNs identified on the VoIP360 Website as a "Local OCN".

1.11 "MRC" means monthly recurring charges

1.12 "NRC" means non-recurring charges.

1.13 "OCN" means operating company number and is used to refer to the OCN of certain telephone companies listed on the VoIP360 Website as an "Enhanced OCN", "Local OCN" and/or "RBOC OCN".

1.14 "Offered Rate Centers" means those certain Rate Centers served by VoIP360 and identified on the VoIP360 Website as an "Offered Rate Center".

1.15 "PSTN" means public switched telephone network.

1.16 "Rate Center" means a uniquely defined geographical area that is associated for telecommunications industry billing purposes with one or more specific NPA/NXX codes.

1.17 "RBOC" or "Regional Bell Operating Company" means those certain OCN's identified on the VoIP360 Website as an "RBOC OCN".

1.18 "Reseller" means an entity that purchases VoIP360 Services from Customer for the purpose of reselling such services to others.

1.19 "Subscriber" means a Customer's customer that uses a VoIP360 Service (and may include a Reseller's customer).

1.20 "TN" means the telephone number assigned by VoIP360 to Customer for use by Customer's Subscribers with the VoIP360 Service.

1.21 "Total Minutes" shall mean the total seconds of Call Time of all calls that terminate in a Billing Cycle divided by 60 and rounded up to the nearest minute.

1.22 "VoIP" means voice over internet protocol.

1.23 "VoIP LCA" means those certain LCAs served by the NPA-NXX listed on the VoIP360 Website as the "Enhanced Termination NPA-NXX List" where VoIP360 has established a physical point of presence that enables VoIP360 to terminate calls originated in IP format as a local call.

1.24 "VoIP360 Service" means the Services described in Articles 2 and 7 (excluding Sections 2.6 and 2.7).

1.25 "VoIP Traffic" means a call that originates in IP at the Subscriber premises using IP-Telephone handsets, end-user customer premises IP adapters, CPE-based IP-Telephone Management "plug and play" hardware, IP-Telephone application management and monitoring hardware or such similar equipment and is transmitted over a broadband connection to the VoIP provider

1.26 "VoIP360 Website" means that certain page or pages at www.360networks.com that identify or list the relevant OCN or Enhanced Termination NPA-NXX List in the foregoing definitions. VoIP360 may revise the OCN and Enhanced Termination NPA-NXX List at any time in its sole discretion, which revisions shall become effective upon posting to the VoIP360 Website or other notice to Customer, whichever is first.

2. Services.

2.1 Service Descriptions.

a. **"Inbound Calling"**: A Service that connects both Local Calls and long distance calls (except in-bound collect calls) *from* a calling party *to* a Subscriber's Activated TN. This Service does not include 911 Service or termination of certain calls described in Section 2.7 (Exclusions) below. Inbound Calling is available in Offered Rate Centers only.

b. **"Local Termination"**: A Service in which VoIP360 delivers VoIP Traffic *from* Customer to the PSTN for Local Call termination in Offered Rate Centers only. Local Calls sent to VoIP360 that are not within VoIP360's Offered Rate Centers shall be rejected back to Customer with an error message.

c. **"Enhanced Termination"**: A Service that connects VoIP Traffic *from* Customer to the PSTN for termination within a VoIP LCA. Customers that order Enhanced Termination agree to the following terms and conditions: (i) Customer warrants that all calls delivered to VoIP360 for Enhanced Termination shall be VoIP Traffic and that any non-VoIP Traffic shall be subject to the Non-VoIP Traffic Surcharge in Exhibit A; (ii) Calls that are not routed for termination within a VoIP LCA shall be terminated as Outbound LD for the fees and upon the terms and conditions described in Section 2.3(d).

2.2 Service Delivery / Combinations. Customers receive Inbound Calling, Local Termination and Enhanced Termination by ordering a combination of TNs, CCSs and or Unlimited Termination (as set forth in Exhibit A) as follows:

a. "**TN Basis**": A Service whereby VoIP360 provides a single line service with a single Activated TN without capacity limitations and provides Customer Inbound Calling and Local Termination to Subscribers utilizing Activated TNs assigned exclusively by VoIP360 Outbound LD is purchased separately on a per minute rate as described in Exhibit A and must be originated from an Activated TN.

b. "**Two-Way CCS**": A Service whereby VoIP360 provides a certain amount of CCS capacity that will support a maximum number of calls that can be made or received at the same time and provides Customer Inbound Calling and Local Termination to Subscribers utilizing Activated TNs assigned exclusively by VoIP360. Customers must utilize CCSs for both Inbound Calling and Local Termination. Outbound LD is purchased separately on a per minute rate as described in Exhibit A and must be originated from an Activated TN.

c. "**Inbound CCS**": A Service whereby VoIP360 provides a certain amount of CCS capacity that will support a maximum number of calls that can be received at the same time and provides Inbound Calling to Subscribers utilizing Activated TNs assigned exclusively by VoIP360

d. "**Enhanced Two-Way CCS**": A Service whereby VoIP360 provides a certain amount of CCS capacity that will support a maximum number of calls that can be made or received at the same time and enables Customer to utilize Inbound Calling, Local Termination, Enhanced Termination and Outbound LD. Local Termination, Enhanced Termination and Outbound LD calls may originate from both VoIP360 and non-VoIP360 TNs. *Customers that order Enhanced Two-Way CCS agree to the following additional terms:* (i) Customers must utilize CCSs for all Enhanced Two-Way CCS Services; (ii) Local Termination, Enhanced Termination and Outbound LD are charged on a per minute of use at the Metered Calling Rates in Exhibit A; (iii) Customer warrants that all Enhanced Termination calls are VoIP Traffic except Local Calls which may be non-VoIP Traffic; (iv) Non-local traffic that originates on the PSTN may be subject to switched access charges to be paid by the originating carrier to the terminating carrier; (iv) Customer agrees to maintain at least fifty percent (50%) of Customer's Enhanced Termination and Local Termination minutes in each Billing Cycle for termination to an end-user served by a Local or Enhanced OCN and agrees to pay up to a $0 005 per minute surcharge for the number of minutes in each Billing Cycle by which non-Local and non-Enhanced OCN minutes exceed fifty percent (50%) of Customer's total Termination minute volume.

e. "**Unlimited Termination**": A Service whereby VoIP360 provides Local Termination and Enhanced Termination without requiring Customer to purchase CCS capacity. Calls may originate from both VoIP360 and non-VoIP360 TN's. *Customers that order Unlimited Termination agree to the following additional terms*: (i) Customer agrees to maintain at least fifty percent (50%) of Customer's Unlimited Termination minutes in each Billing Cycle for termination to an end-user served by a Local or Enhanced OCN and agrees to pay up to a $0.005 per minute surcharge for the number of Unlimited Termination minutes in each Billing Cycle by which non Local or Enhanced OCN minutes exceed fifty percent (50%) of Customer's total Unlimited Termination minute volume; (ii) Unlimited Termination calls that do not meet the requirements for Local Termination or Enhanced Termination will be terminated as Outbound LD for the fees and upon the terms and conditions described in Section 2.3(d), below; (iii) This Service does not include 911 Service or termination of certain calls described in Section 2.7 (Exclusions) below

2.3 Optional Services. Customer may, for an additional Fee, order the optional Services described below:

a. Local Number Portability (or "LNP")

(i) Port-In. By submission of a Service Order to activate a TN, Customer may request that VoIP360 "port" existing telephone numbers registered to other carriers to VoIP360 ("Port-In Request"). Upon submission of each Port-In Request, Customer represents and warrants that it has received all rights and authorizations required by the FCC and state regulatory commissions necessary for the porting sought in that request, and Customer shall promptly provide VoIP360 with documentation evidencing Customer's receipt of such rights and authorizations upon request. Customer shall keep such documentation for at least two (2) years. VoIP360 may, in its sole discretion, refuse to "port" in a number for any reason, including without limitation, Customer's failure to pay any amounts when due, Customer's credit rating, the requested Rate Center is not an Offered Rate Center or if Customer fails to provide or maintain the documentation required above. Customer shall indemnify, defend and hold harmless VoIP360 for any third party claim or expense arising from any porting (or requested porting) performed by VoIP360 hereunder, including without limitation, claims by Subscribers and/or any governmental agency. A Non-recurring "Port-In Fee" shall be incurred upon receipt by VoIP360 of the Port-In Request and any subsequent modification or cancellation of a Port-In Request will incur an additional "Change Fee" or "Cancellation Fee", all as set forth in Exhibit A. If VoIP360 requires additional or corrected information or documentation to Port-In a telephone number and Customer fails to provide such information or documentation within ten (10) days of such request, VoIP360 may terminate the Port-In Request without further obligation or liability and Customer shall pay the Cancellation Fee In the event the donating carrier imposes any fees on VoIP360 to Port-In a TN, Customer agrees to reimburse VoIP360 for such fees ("Donating Carrier Charge"). With respect to large volume Port-In Orders (e g Bulk Orders and Enterprise Orders), certain discounts may apply provided and additional terms and conditions apply, all as described in Exhibit A

(ii) Port-Out. Upon receipt of a request from a third-party to port a Subscriber's Active TN to another carrier ("Port-Out Request"), VoIP360 may port such TN as requested and Customer agrees that VoIP360 shall have no liability to Customer or Subscriber for the porting out of such TN. Non-recurring "Port-Out Fees" shall be incurred upon receipt by VoIP360 of the Port-Out Request and any modification or cancellation of such request will incur an additional "Change Fee", all as described in Exhibit A and Customer agrees to pay such Fees in accordance with this Agreement.

b Directory Listing (U.S. numbers only). Customer may, by submission of a Service Order, request that VoIP360 provide the Subscriber's Activated TN, name and address ("Primary Listing") to: (i) directory assistance *and* the local white pages (or similar directory) ("Listed Number"), (ii) directory assistance only ("Non-Listed Number") or (iii) request that the Primary Listing not appear in directory assistance or the local white pages ("Non-Published Number") All requests for a Listed, Non-Listed or Non-Published Number shall be referred to as a Directory Listing. Upon the submission of each Directory Listing, Customer represents and warrants that it has obtained all necessary approvals from the Subscriber for the Directory Listing requested in that request, and Customer shall promptly provide VoIP360 with documentation evidencing Customer's receipt of such authorization upon request. Customer shall keep such documentation for at least twelve (12) months. VoIP360 may, in its sole discretion, refuse to submit the Subscriber information for the Directory Listing in the event Customer is unable timely to provide such evidence satisfactory to VoIP360. Customer expressly agrees that VoIP360 shall have no liability to Customer, Subscribers or any third parties, for any claims, damages or expenses arising from or related to a Directory Listing that VoIP360 performs, fails to perform or incorrectly performs, including without limitation, (i) Non-Published Number requests that are erroneously Listed or Non-Listed, and (ii) Listed Number requests that contain incorrect information or end up Non-Listed or Non-Published, and Customer shall indemnify, defend and hold harmless VoIP360 from and against all such claims and agrees that Customer's sole and exclusive remedy shall be a refund of the Fees paid for such requested Directory Listing. Fees shall be incurred upon receipt by VoIP360 of each Directory Listing request and any subsequent modification of such request will incur an additional "Change Fee" as set forth in Exhibit A

c Operator Services VoIP360 shall enable Subscribers to access automated or live operator transmission services for credit card calling, collect-to-destination calls, third party billing calls, operator receiving and acting on billing and call completion information, validation, and responding to rate requests ("Operator Services") unless Customer's equipment prevents Subscribers from such access Operator Services will be provided by a third party (the "OS Vendor"). The charges and rates for Operator Services ("OS Fees") are as described in the tariffs filed by the OS Vendor. The OS Vendor shall charge the OS Fees to the Subscriber's credit card based on the information provided by the Subscriber and Customer warrants that Subscriber's have been notified that such charges may apply. VoIP360 may receive payments from the OS Vendor based on the OS Fees paid by Subscribers and Customer and Subscriber's consent to such payments.

d Outbound LD. Outbound domestic long distance is a Service whereby VoIP360 connects a VoIP Traffic call *from* a caller *to* a called party located within a different LCA in the U.S or Canada. ("Outbound LD"). Customer orders or is provided Outbound LD as set forth in Exhibit A. Additional fees will be assessed for Outbound LD on a per minute basis (the "LD Fees") at the Metered Calling Rate set forth in Exhibit A and Customer agrees solely to be responsible for and pay VoIP360 such LD Fees. Outbound LD terminated to Canada will be billed at the separate rate set forth in Exhibit A. VoIP360 may impose a surcharge for Outbound LD to Hawaii, Alaska and U.S Territories (not to exceed VoIP360's actual cost). Call Time may include a minimum number of seconds per call (not to exceed thirty (30) seconds) and be calculated in increments of up to six (6) seconds per increment. Customer agrees to the following additional terms with respect to Outbound LD:

(i) VoIP LCA Requirement. Customer represents that all Outbound LD delivered to VoIP360 for termination into a VoIP LCA shall be VoIP Traffic and that any such non-VoIP Traffic shall be subject to the Non-VoIP Traffic Surcharge in Exhibit A. If VoIP360 is unable to determine the jurisdiction of a call, the call will be considered an interstate call. Non-local traffic that originates on the PSTN may be subject to switched access charges to be paid by the originating carrier to the terminating carrier

(ii) Interstate Calling Requirements. Customer agrees to maintain at least seventy percent (70%) of Customer's total Outbound LD minutes for termination as an Interstate call (i.e., a call for which the originating ANI and terminating ANI are associated with LCAs located in different states). VoIP360 shall have the right to apply and Customer agrees to pay VoIP360 up to a $0.10 per minute surcharge for the number of minutes by which non-Interstate minutes exceed thirty percent (30%) of Customer's total Outbound LD minutes.

(iii) RBOC Calling Requirements. Customer agrees to maintain at least seventy percent (70%) of Customer's total Outbound LD minutes for termination to an end-user served by an RBOC OCN and subject to such RBOCs tariffed access charges. VoIP360 shall have the right to apply and Customer agrees to pay VoIP360 up to a $0.025 per minute surcharge for the number of minutes by which Non-RBOC OCN minutes that exceed thirty percent (30%) of Customer's total Outbound LD minute volume

(iv) Caller Location. For purposes of determining the location of a call, VoIP360 may use the information provided by the JIP indicator and calls originating from a different location than the called number will be billed at the Outbound LD rate set forth in Exhibit A.

e CNAM (or Caller ID) Caller identification with name (or CNAM) will enable a Subscriber to identify the telephone number and name of the caller calling the Subscriber so long as the Subscriber utilizes telephone equipment that is CNAM-enabled and the caller does not have an unlisted telephone number or originate the call utilizing facilities that do not support accurate CNAM. Customer may, in Exhibit A, request that VoIP360 enable CNAM on Activated TNs VoIP360 makes no representations or warranties with respect to the accuracy or availability of CNAM and VoIP360 shall have no liability to Customer or Subscribers in the event CNAM is not accurate or available at all times

f CNAM Data Entry. Upon TN Activation, VoIP360 shall populate the LIDB/CNAM database with the information about the Subscriber (if any) that has been provided by Customer

VoIP360 may limit the information entered into the database based on the restrictions of the database service provider. Customer may request that VoIP360 change the information in the LIDB/CNAM database Customer is solely responsible for ensuring the accuracy of the Subscriber information provided to VoIP360 and VoIP360 makes no representation or warranty that CNAM calls that dip the LIDB/CNAM database will result in a correct CNAM listing Fees for Services in this section 4 3(f) are set forth in Exhibit A.

g. Directory Assistance (U.S. numbers only). VoIP360 shall provide Subscribers access to a live or automated operator for directory assistance ("Director Assistance") unless Customer's equipment prevents such access. Directory Assistance may not be available to terminate calls to the number requested. VoIP360 makes no representations or warranties with respect to the accuracy or availability of Directory Assistance and VoIP360 shall have no liability to Customer or Subscribers in the event Directory Assistance is not accurate or available at all times Additional fees per call will be assessed for each Directory Assistance attempt at the rate set forth in Exhibit A and Customer agrees to pay such Fees in accordance with this Agreement

h. Expedite Request. Customer may request that certain TN Activations, CCS Activations and Port-In Requests be provisioned in less than VoIP360's standard interval described in the SLA for such Services ("Standard Interval") by submission of a Service Order describing the TNs, CCSs and/or Port-Ins to be expedited and the requested installation date and VoIP360 will use commercially reasonable efforts to provision such Services by the requested installation date. In the event VoIP360 provisions more than fifty percent (50%) of such Services at least one day less than the Standard Interval, Customer shall pay the Expedite Fee set forth in Exhibit A VoIP360 shall have no obligation to accept a Service Order to expedite provisioning of Services and no liability for failing timely to provision such Services

i. Service Reconfiguration. Customer may, by submission of a Service Order, request that VoIP360 revise, replace and/or modify its (i) IP Address and/or (ii) the method, configuration and/or Trunks over which its Services are delivered ("Service Reconfiguration") VoIP360 will use commercially reasonable efforts to complete the Service Reconfiguration within five (5) business days (or less if Customer agrees to pay the Expedite Fee). Upon completion of the Service Reconfiguration, Customer shall pay the Reconfiguration Fee. VoIP360 shall have no obligation to accept a Service Order for Service Reconfiguration or liability for failing to perform such Service Reconfiguration (even after the Service Order is accepted)

2.4 NOC Support. VoIP360 shall operate and maintain a Network Operations Center ("NOC") capable of receiving network alarms twenty-four (24) hours a day, seven (7) days a week and shall provide NOC support for the VoIP360 Services as described below VoIP360 shall maintain a toll-free telephone number for Customer to contact personnel at the NOC. VoIP360 shall be responsible for monitoring and use commercially reasonable efforts to maintain the network to provide service availability and will work with Customer on any chronic issue resolution Notwithstanding the foregoing, VoIP360 shall not be responsible to interface directly with Subscribers and shall not be responsible for troubleshooting individual Subscriber issues Customer shall conduct such interface and resolution at its sole cost and expense.

2.5 CDR VoIP360 will use reasonable efforts to post Customer's CDRs on Customer's order entry portal within five (5) business days following the end of every month and shall leave such CDRs up for two (2) months. VoIP360 may remove such CDRs at any time without notice in the event it suspects such CDRs are being improperly accessed, distributed or misused. Customer represents and warrants that all such CDRs are utilized by Customer maintained in Customer's network in accordance with all Federal, State and local laws, including without limitations, all customer proprietary network information ("CPNI") and privacy laws and that Customer shall prevent unauthorized third parties from accessing such CDRs. VoIP360 will use commercially reasonable efforts to provide accurate CDRs, however, VoIP360 makes no representation or warranty as to the accuracy of such CDRs and shall have no liability for any errors or omissions in such CDRs. Customer CDRs are for informational purposes only and Customer shall not utilize such CDRs to generate billing to their customers or Subscribers. Customer agrees to indemnify, defend and hold harmless VoIP360 Indemnified Persons for any breach of the foregoing representation and warranty and for any third parties that access such CDRs through Customer's network.

2 6 Service Limitations. VoIP360 Service is only offered in those Rate Centers identified on the VoIP360 Website as an "Offered Rate Center" and reserves the right to add or delete Rate Centers at any time, provided that, existing Services ordered by Customer shall not be affected without thirty (30) days' prior notice to Customer VoIP360 shall (unless the Parties have expressly agreed otherwise) use commercially reasonable efforts to provide the VoIP360 Services. VoIP360 makes no representation or warranty that Service will be available at all times and, except as provided in the SLA, shall have no liability to Customer in the event a Service is temporarily unavailable. Notwithstanding the foregoing, the SLA shall not apply to Unlimited Termination Services and Customer's sole and exclusive remedy is Service deactivation as described in Section 4.7. Customer may not use Outbound LD to terminate any non-VoIP Traffic into a VoIP LCA unless such call is a Local Call

2.7 Service Exclusions. Customer shall not use (and shall require that Subscribers do not use) the VoIP360 Service for: (a) calls to NPA-976-XXXX; (b) calls to 900-NXX-XXXX; (c) inbound collect calls; (d) calls to any other numbers or services where under normal telecommunications industry arrangements the calling party is to be billed for the call by the calling party's carrier on behalf of the terminating carrier or the terminating carrier's customer; (e) outbound international long distance (except Canada); (f) with respect to Unlimited Termination, 911 Services and, in the event a 911 call is inadvertently delivered to VoIP360, it will be sent to the Emergency Call Routing Center and the Manual Event Fee in Exhibit A will apply; and (g) with respect to Unlimited Termination and Outbound LD, dialers, hammers or other devices which send a large amount of traffic from a single calling source and, if VoIP360 suspects that such a

device is being used, VoIP360 will notify Customer to investigate the Source and if Customer cannot stop the suspected traffic, VoIP360 may, in its own discretion, suspend all Termination Services, block suspected service, or take whatever action deemed necessary to stop such traffic and protect the integrity of the network (collectively "Excluded Service"). VoIP360 shall have no liability to Customer or Subscribers for any Excluded Service. Customer shall be responsible for and defend, indemnify and hold harmless VoIP360 against, any and all claims, costs, charges and expenses whatsoever caused by Customer or Subscriber using the VoIP360 Service for an Excluded Service. Customer shall also be responsible for any fees or charges imposed by payphone operators arising from Inbound Termination

3. Fees

3.1 Price List Pricing for the standard and optional VoIP360 Services shall be as specified in Exhibit A, attached hereto and incorporated herein by this reference. Metered Calling Rates may be changed upon seven (7) days notice; all other pricing and shall be fixed for the Service Term. Recurring and non-recurring Fees ("MRC" and "NRC") will be incurred by Customer upon the Acceptance Date by VoIP360 of a Service Order or as otherwise described herein. MRC for TN, CNAM, and 911 shall commence billing upon TN *Activation*.

3.2 Minimum Monthly Fee. The Minimum Monthly Fee is that certain fee (if any) described in Exhibit A. The Minimum Monthly Fee shall be comprised of VoIP Services only, and shall exclude all other Services unless indicated in Exhibit A. In addition to NRC, Customer shall pay to VoIP360 on a monthly basis the greater of (a) the Minimum Monthly Fee set forth in Exhibit A or (b) the actual MRC. Notwithstanding the foregoing, during the first three (3) months following the Effective Date, (or as otherwise set forth in Exhibit A, attached hereto) ("Ramp Period"), Customer shall only be obligated to pay to VoIP360 the actual fees incurred by Customer for the VoIP360 Services and not the Minimum Monthly Fee

3.3 Deposit. In the event VoIP360 has required a deposit as set forth in Exhibit A (the "Deposit"), such Deposit shall be held by VoIP360 as security for payment of Fees (including any Minimum Monthly Fee) that are not paid when due. In the event Customer fails to pay a Fee when due ("Overdue Fee"), VoIP360 may upon written or electronic notice to Customer withdraw from the Deposit the amount of the Overdue Fee and Customer shall have five (5) business days from such notice to pay VoIP360 the amount of the Overdue Fee which shall be used to replenish the deposit. Failure to timely replenish the Deposit constitutes a default under the Agreement. In the event VoIP360 has not withdrawn any funds from the Deposit for twelve (12) months, Customer may request, and VoIP360 shall, refund the Deposit or apply the Deposit to the next invoice(s) until depleted. In the event Customer is not current in paying Fees or its outstanding balance is in excess of the Deposit, VoIP360 may request an additional Deposit prior to accepting additional Service Orders.

3.4 Payment Terms Article 3 of the Master Terms and Conditions shall describe billing and payment obligations except as follows: (i) MRC for Outbound I.D, Local Termination and Enhanced Termination shall be based on the Total Minutes multiplied by the Metered Calling Rates in Exhibit A; (ii) the first invoice with respect to Service shall contain the Fees, in arrears, for the remaining half of the calendar month of Service (or portion thereof) and thereafter, the Fees will be invoiced once per month in arrears (the "Billing Cycle"); (iii) VoIP360 has the right to disconnect Services or block calls without advance notice if payment for Services in not made by the due date; and (iv) Services may be billed in 6-second increments with a six (6) second minimum for Local Termination and Enhanced Termination. In addition, in the event Customer orders Unlimited Termination, Fees for all VoIP360 Services shall be due and payable within seven (7) days of the invoice date and all payments shall be by wire unless another form of payment has been authorized in writing by VoIP360. This Section shall not affect the billing and payment obligations for any other Services.

3.5 Third Party Fees. Customer agrees that VoIP360 shall have no liability for any fees, charges, damages or claims asserted by any third party against Customer, including without limitation, any RBOC, ILEC, RLEC, CLEC or other telecommunications carrier, as a result of Services provided by VoIP360, including without limitation any claims for inter-carrier compensation.

4 Ordering / Deactivating Service

4.1 Ordering – Unlimited Termination. Customer orders Unlimited Termination by delivering calls to VoIP360 for termination to the PSTN (each such call shall be deemed a "Service Order") and VoIP360 accepts such Service Orders by utilizing a CCS to enable termination of the call. VoIP360 may, at any time for any reason, refuse to accept a Service Order. The number of CCSs used by VoIP360 to provide Services is within VoIP360's sole and absolute discretion and may be changed by VoIP360 at any time.

4.2 Ordering - TN Basis. For Services ordered on a TN Basis, Customer may, by submission of a Service Order, reserve a minimum of ten (10) but no more than one-hundred (100) TNs associated with a specific Offered Rate Center ("TN Reservation"). An authorized representative of Customer and VoIP360 shall evidence the acceptance of each TN Reservation by written or electronic signature thereof. Acceptance may be communicated by VoIP360 either in writing or by E-mail to Customer. VoIP360 makes no representation or warranty that the TNs assigned to fill a TN Reservation will be entirely contiguous or uncontaminated. The date of such communication shall be the "Acceptance Date" for the TN Reservation and the Reservation Fee described in Exhibit A shall be incurred on such date. After the TN Reservation is accepted, Customer may activate TNs in accordance with Section 4.4

4.3 Ordering – Inbound CCS / Two-Way CCS / Enhanced Two Way CCS For Services ordered on a CCS basis, the following process shall be used:

a. TN Reservation. Customer may, by submission of a Service Order, reserve a minimum of ten (10) but no more than one-hundred (100) TNs associated with a specific Offered Rate Center ("TN Reservation") An authorized representative of

Customer and VoIP360 shall evidence the acceptance of each TN Reservation by written or electronic signature thereof. Acceptance may be communicated by VoIP360 either in writing or by E-mail to Customer. The date of such communication shall be the "Acceptance Date" for the TN Reservation and the Reservation Fee described in Exhibit A shall be incurred on such date. VoIP360 makes no representation or warranty that the TNs assigned to fill a TN Reservation will be entirely contiguous or uncontaminated. After the TN Reservation and CCS Activation (described below) are accepted, Customer may activate TNs in accordance with Section 4.4. MRC for each reserved TN may apply if expressly set forth in Exhibit A.

b. CCS Activation. Customer may, by submission of a Service Order, activate Concurrent Call Sessions ("CCS Activation"). Customer may submit TN Reservations and CCS Activations concurrently. An authorized representative of Customer and VoIP360 shall evidence the acceptance of each CCS Activation request by written or electronic signature thereof. VoIP360 shall provide Customer with notification when each CCS is activated and such CCS shall be deemed an "Activated CCS". Unless Customer delivers written notice to VoIP360 within two business days that the CCS is not functioning properly, the CCS shall be deemed accepted upon "Activated CCS" notification and the date of such notification shall be the "Acceptance Date". In the event that Customer notifies VoIP360 within two business days that the CCS is not functioning properly, then VoIP360 shall correct any deficiencies in the CCS and reactivate the CCS, after which the process stated herein shall be repeated. Except as otherwise set forth in Exhibit A, MRC for each Activated CCS shall commence upon "Activated CCS" notification.

4.4 TN Activation. After a TN Reservation has been accepted by VoIP360, Customer may, by submission of a Service Order, request activation of certain TNs ("TN Activation Request"). VoIP360 shall provide Customer with notification when each TN is activated and the TN shall be deemed an "Activated TN". Unless Customer delivers written notice to VoIP360 within two business days that the TN is not functioning properly, the TN shall be deemed accepted upon "Activated TN" notification and the date of such notification shall be the "Acceptance Date". In the event that Customer notifies VoIP360 within the first two days after the Acceptance Date that the VoIP360 Service is not installed and functioning properly, then VoIP360 shall correct any deficiencies in the Service and reactivate the TN, after which the process stated herein shall be repeated. Except as otherwise set forth in Exhibit A, MRC for each Activated TN shall commence upon the Acceptance Date. TNs that are Ported-In to VoIP360, shall be considered Activated TNs.

4.5 Unused TNs. In the event Customer has not submitted a TN Activation Request for a reserved TN within sixty (60) days of the date of the applicable TN Reservation Order, VoIP360 may, immediately upon written or email notification to Customer, reclaim such TN without any refund or credit issued to Customer for fees previously paid to VoIP360 for such TN.

4.6 Forecasts. Customers ordering VoIP360 services shall provide forecasts as follows:

a. TN / Rate Center Forecasts. Upon submission of a Service Order, submit to VoIP360 a non-binding forecast of all anticipated requests to reserve and activate TNs on a Rate Center by Rate Center basis. Customer shall update such forecasts each calendar quarter thereafter during the Service Term.

b. Capacity Forecasts. Prior to ordering Services, Customer agrees to provide a forecast (in a form and content acceptable to VoIP360) which will enable VoIP360 to estimate Customer's capacity requirements. Customer agrees to update such form from time to time as requested by VoIP360. VoIP360 may also request and customer shall provide within 5 (five) days, the projected total Call Time in each NPA-NXX or Offered Rate Center in which Customer intends to order services from VoIP360.

4.7 Service Deactivation.

a. TN/CCS Deactivation. To deactivate an Active TN or CCS, Customer must, in a Service Order, request deactivation and provide to VoIP360 all of the information reasonably requested for such deactivation ("Deactivation Request"). VoIP360 shall deactivate such TN or CCS within two (2) business days of receipt of a properly completed Deactivation Request (the "Deactivation Date") and Customer shall have no further liability with respect to such TN or CCS, provided that, such deactivation shall not affect Customer's Minimum Monthly Fee, if any. In addition, VoIP360 may deactivate a TN or CCS at any time for any reason at the expiration of thirty (30) days' written notice provided to Customer ("Deactivation Date") and such deactivated TN(s) shall reduce Customer's Monthly Fee. Customer shall remain liable for all Fees incurred up to and including the Deactivation Date. The deactivated TN shall be returned to the Customer's inventory and will be subject to reclamation as described in Section 4.5. In the event a Service is terminated for any reason, Customer shall be responsible for terminating or transitioning services provided to its Subscribers in compliance with all applicable laws, rules and regulations, including without limitation, providing any required notice to its Subscribers of such termination. In no case shall VoIP360 be responsible for providing notice to Subscribers, and Customer shall defend and indemnify VoIP360 for all claims against VoIP360 due to any failure properly to provide such notice or perform any other obligations with respect to such termination.

b. Unlimited Termination Deactivation. With respect only to Unlimited Termination Services, notwithstanding anything to the contrary in this Agreement, the Parties understand and agree that: (i) either Party may, without any obligation or liability, reroute, block or terminate Service on any Unlimited Termination calls at any time and (ii) in the event Customer is not satisfied with VoIP360's packet delivery, latency, jitter, dropped calls or similar measures of quality of service for Unlimited Termination, Customer's sole and exclusive remedy is to reroute its traffic and Customer shall have no claim for any refund, credits or damages whatsoever and all such claims are expressly waived. This subsection (b) shall only apply to Unlimited Termination Services and shall not apply to any other Service.

4.8 Service Terms. The following Service Terms shall apply: (i) with respect to the Minimum Monthly Fee and the Price List, the Service Term shall be as set forth in Exhibit A; (ii) with respect to each Activated TN or CCS, the Service Term shall be from the Acceptance Date to the Deactivation Date and, (iii) with respect to Unlimited Termination, the Service Term shall be each Service Order as measured by Call Time with respect to each call

4 9 Orders From Resellers. Except as otherwise expressly agreed in an addendum to this Agreement, Resellers are not authorized to order Services directly from VoIP360 and Customer shall be responsible for placing all Service Orders, TN Reservation, TN Activation and TN Deactivation Requests for its Resellers. Customer shall remain the VoIP360 customer of record. Resellers are not third party beneficiaries under this Agreement, VoIP360 shall have no obligation or liability with respect to such Resellers and Customer shall indemnify, defend and hold harmless VoIP360 from and against any claim by a Reseller against VoIP360 arising from or related to this Agreement

5 Termination Charge.

5.1 Customer Termination At any time after the Effective Date, Customer may terminate the Agreement with respect to all VoIP360 Services by written notification to VoIP360. Unlimited Termination, Outbound LD and/or the VoIP360 Service for all TNs associated with that Service Order shall terminate thirty (30) days thereafter, at which time Customer shall pay VoIP360 a termination charge equal to the sum of fifty percent (50%) of the remaining Minimum Monthly Fees that would have been incurred for the remainder of the Service Term in Exhibit A of this Agreement (the "Termination Charge"), plus all Fees incurred prior to the date of termination of Services.

5.2 Customer Default. In addition to all other remedies, in the event of a default by Customer and termination of this Agreement with respect to VoIP360 Services (but not other Services), Customer agrees to pay upon demand the Termination Charge The Parties acknowledge that the cancellation or termination charges set forth in this Article 5 are a genuine estimate of the actual damages that VoIP360 will suffer and are not a penalty.

6. Customer Responsibilities

6 1 Technical Requirements.

a. All Customer connections must use IP for their packet transport protocol. The VoIP360 platform does not support TDM (such as T1 or ISDN PRI) for Customer connections. The underlying packet transport protocol (such as HDLC or PPP) is specific to the type of customer connection

b. All Customer connections must have some shared IP address space and IP addressing scheme. When Customer uses multiple IP addresses, it must provide an IP address and subnet mask, creating a contiguous range of IP addresses. The VoIP360 platform supports any of the following Customer IP address assignment schemes:

(i) A single IP address for both VoIP Signaling and VoIP Transport;
(ii) A single IP address for VoIP Signaling and a single IP address for VoIP Transport;
(iii) A single IP address for VoIP Signaling and multiple IP addresses for VoIP Transport.

c All Customer connections must use SIP for their VoIP signaling protocol. The VoIP360 platform does not support other VoIP signaling protocols (such as H.323, MGCP, H.248/Megaco, J.162/NCS, etc.). Customer connections may also use VoIP signaling protocols derived from SIP (such as CMSS), but those protocols and their implementations must be evaluated by VoIP360 on a per connection basis.

d. All Customer connections must support/expect SIP Back-to-Back User Agent (B2BUA) mode. The VoIP360 platform does not support other SIP modes (such as proxy mode or redirect mode) for PSTN termination or inter-customer calls. Customer connections that utilize the VoIP360 platform for intra-customer calls must be evaluated by VoIP360 on a per customer connection basis, but may be configured to support any SIP support mode.

e. When VoIP360 Service is provided to Customer on a Concurrent Call Basis, then all Customer connections must have some number of virtual DS0s available to them The VoIP360 platform will limit the number of simultaneous calls to the number of virtual DS0s When configured for 911 Services, the VoIP360 platform will continue to forward 911 calls even if the virtual DS0 limit has been reached

f. Customers must encode their voice traffic and encapsulate it in IP prior to delivering it to VoIP360. Customers may utilize any of the following codecs:

(i) ITU-T G.711 PCM (A-law or μ-law)
(ii) ITU-T G 726 ADPCM (40kbps, 32kbps, 24kbps, or 16kbps)
(iii) ITU-T G.729 CS-ACELP
(iv) ITU-T G 729a Reduced Complexity CS-ACELP
(v) ITU-T T 38 Facsimile

The VoIP360 platform will accept VoIP signaling messages that indicate the VoIP bearer path will be encoded with any of these codecs.

g Customers may include more than one encoded voice frame per packet to ameliorate the impact of the IP header overhead on the bandwidth required for each call. Customers may utilize any of the following variable payload sizes:

(i) 10-Byte (G 729/a single-frame)
(ii) 20-Byte (G 726, G 729/a dual-frame)
(iii) 40-Byte (G.711, G 726, G.729/a quad-frame)
(iv) 80-Byte (G.711, G 726)

The VoIP360 platform will accept VoIP signaling messages that indicate the VoIP payload will be one of these sizes

h VoIP360 may require Customer to utilize separate IP addresses ("Trunks") for different VoIP360 Services and/or Activated TNs and Customer shall be solely responsible for ensuring that the traffic appropriate for each Service is routed over the appropriate Trunk Customer shall be responsible for Fees and surcharges incurred due to traffic that is routed over an incorrect Trunk to the extent such misrouting was not caused by VoIP360. Customer shall be responsible for assigning Activated TNs to the appropriate Trunk and ensuring that all information related to such TN is accurate. Customer may re-assign an Activated TN from one Trunk to a different Trunk by submitting an internal port Service Order and paying a non-recurring Fee of $5 00

6 2 Automatic Number Identification (ANI) Customer shall provide VoIP360 with valid ANIs for all calls (except Enhanced Termination calls) utilizing the VoIP360 Service. In the event no-ANI or invalid-ANI calls ("Non-ANI Call") exceed three percent (3%) of the total calls (excluding Enhanced Termination calls) for all Subscribers of a Customer during any Billing Cycle, VoIP360 may, in its discretion, charge Customer the Non-ANI Call Fee set forth in Exhibit A in lieu of the Fee otherwise applicable to such call

6.3 Services - For Resale Only. Customer represents and warrants that, with respect to the VoIP360 Services provided by VoIP360 to Customer, that Customer: (i) is not an end-user or Subscriber of such services, and; (ii) is using such services for wholesale or resale telecommunications, or as a component of an interconnected VoIP product to be resold or leased in the normal course of business. Customer further agrees that VoIP360, as the underlying network provider of a local exchange service, shall be entitled to receive, from the purchaser of Switched Access, any appropriate access charges pursuant to VoIP360 then effective Switched Access Tariff, price list, rate schedule or applicable carrier to carrier agreement.

6.4 Federal Communication Commission ("FCC") Registration. Customer represents and warrants that it is properly registered with the FCC and has obtained a Form 499 filer ID number. Customer further acknowledges and agrees that VoIP360 is not calculating, collecting or remitting any Universal Service Fund fees or charges for or on behalf of Customer or its Subscribers. Customer certifies that it will contribute directly to state and federal universal service support mechanisms with regard to the services purchased by it pursuant to this Agreement according to current law, rule or regulation. Customer shall defend and indemnify VoIP360 for any claims, damages or fines against VoIP360 arising out of Customer's failure to comply with FCC and/or state regulatory commission rules and regulations.

6.5 VoIP Traffic. Customer represents and warrants that it shall utilize Enhanced Termination exclusively for VoIP Traffic Customer shall not, and Customer shall not allow any third-party for whom it is originating VoIP traffic, to make non-VoIP Traffic delivered to VoIP360 appear as VoIP Traffic, including without limitation, adding, deleting or modifying in any manner the traffic, the signaling information concerning such traffic or the equipment used to generate or propagate such traffic In addition to all other rights and remedies, VoIP360 may impose the surcharge in Exhibit A ("Non-VoIP Traffic Surcharge") for traffic that is Non-VoIP Traffic that Customer has represented represents is VoIP Traffic.

6.6 Interoperability Questionnaire / Production Questionnaire ("Questionnaires"). The Questionnaires contain technical information concerning Customer's equipment and configuration, Customer account information, and certain Services Customer is requesting (i.e., CNAM and Outbound Long Distance) or providing on its own (i.e., 911-opt out) for all TNs. The Interoperability Questionnaire shall be completed by the Customer prior to entering into interoperability testing with VoIP360 The Production Questionnaire shall be completed by the Customer after interoperability testing has been completed and prior to the customer going into the production environment.

6 7 Estimated Usage. Prior to ordering Unlimited Termination, Customer agrees to provide a forecast with the projected call volume by month in each NPA-NXX or Offered Rate Center in which Customer intends to order services from VoIP360 (in a form and content acceptable to VoIP360) Customer agrees to update such form from time to time as requested by VoIP360

7. 911 Services.

7.1 911 Service Description. A Service that allows certain Subscribers with an Active TN to contact emergency services. 911 Service includes E911 Service and/or Basic 911 Service as determined by the capabilities of the Public Safety Answering Point ("PSAP"). E911 Service means that a 911 call is routed to the PSAP assigned to the Subscriber's Service Address (as communicated to VoIP360 hereunder) and information regarding the Subscriber's Service Address, as provided to VoIP360 by Customer, is provided to the PSAP. "Basic 911 Service" means that a 911 call will be routed to the PSAP assigned to the Subscriber's Service Address (as communicated to VoIP360 by Customer) but such call will not provide to the PSAP the caller's location information and/or call back number.

7.2 911 Service Delivery. Customers that order TN Basis, Two-Way CCS and Enhanced Two-Way CCS for Subscribers utilizing an Activated TN assigned by VoIP360 will receive 911 Service unless Customer opts out in accordance with Section 7 3, below. Customer shall obtain and maintain accurate Subscriber (including Reseller's Subscribers) information and promptly to deliver such information to VoIP360 (in a manner designated by VoIP360) so that VoIP360 can provide such Customer-provided information to applicable national databases (e.g., Automatic Local Identification (ALI) Database). Customer shall deliver to VoIP360 valid postal addresses and associated physical Service Addresses that can be verified against the Master Street Address Guide ("MSAG"). Customer shall also advise Subscribers, and shall require Resellers to advise their Subscribers, of Subscriber's obligation to provide valid, updated Service Address information that is verifiable against MSAG. Customer shall also promptly provide VoIP360 with any updates to a Subscriber's Service Address and ensure that Subscribers do not use VoIP360 Service from a location different from the Subscriber's Service Address or where 911 is not available. 911 Services will not function until

the TN and associated Service Address of the Subscriber has been accurately input into the required database(s) (e g., ALI database). Customer will cooperate with VoIP360 so that such inputs may be performed at the time of VoIP360 Service activation for each TN. Customer shall indemnify and hold harmless VoIP360 against any and all claims and expenses resulting from Subscriber's, Customer's or any Reseller's failure to comply with this Section 7.2.

7.3 Opting Out of 911 Service. Customers receiving TN Basis, Two-Way CCS and Enhanced Two-Way CCS Services from VoIP360 may opt-out of receiving 911 Service on all Activated TNs ("Total Opt-Out") or only certain Activated TNs ("Partial Opt-Out") by (i) executing Attachment 1 (attached hereto) and (ii) opting-out of 911 in Exhibit A. Customers that opt-out of receiving 911 Service on any Activated TNs represent and warrant that they have already made arrangements with a third party provider of 911 connectivity to ensure that all of its Subscribers' calls to 911 are properly routed to the appropriate PSAPs or default answering points and are in compliance with 47 C.F.R. Part 9. In the event the Customer desires a Partial Opt Out, Customer must order separate Trunks for calls that include 911 Service and calls that do not include 911 Service. It is the Customer's sole and exclusive responsibility to ensure that all calls sent to VoIP360 are correctly routed over the proper Trunks. Additional Trunking requirements are described in 6.1.h.

7.4 911 Service Functional Limitations. Customer acknowledges that 911 Services will not function, or will not function properly, in the following situations: (a) if a Subscriber attempts to place a 911 call from any location other than the Subscriber's Service Address as communicated to VoIP360 by Customer; (b) if power is disrupted at the Subscriber Service Address; (c) if Internet connectivity is disrupted at the Subscriber Service Address; (d) if service to a Subscriber is cancelled or suspended for any reason (e.g., payment default); (e) if Subscriber provides VoIP360 with incorrect or invalid Subscriber Service Address information; (f) if Subscriber fails to notify VoIP360 of any update to Subscriber's Service Address information; or (g) if equipment provided to or used by the Subscriber in connection with VoIP360 Service malfunctions or is improperly installed or configured. If VoIP360 has agreed to provide VoIP360 Services to Customer in a Basic 911 Area, VoIP360 shall only be obligated to provide basic 911 Service and not E911 Service. In the event that the PSAP in a Basic 911 Area deploys the equipment necessary to enable E911 Services and VoIP360 is unable (in a timely manner) to provide E911 in such Basic Area through its current E911 vendor, then VoIP360 may, upon thirty (30) days' written notice to Customer, terminate the Services provided to Customer in such Basic 911 Area without further obligation or liability. Customer shall be responsible for all Fees incurred to the date of such termination and solely be responsible for notifying affected Subscribers. 911 Service is not available for Inbound CCS and Unlimited Termination

7.5 Legal Requirements (47 C.F.R. Part 9) Customer acknowledges that by providing VoIP360 Service to Subscribers, Customer may be providing an "Interconnected VoIP Service" as that term is defined in 47 C.F.R. § 9.3 and that Customer may be subject to all requirements of 47 C.F.R. Part 9 that apply to the provision of such service. As between Customer and Subscribers or any other third party, Customer, and not VoIP360, shall have the responsibility to comply with all requirements of 47 C.F.R. Part 9, including without limitation, (a) obtain from each Subscriber, prior to the initiation of service, the physical location at which the service will be utilized ("Service Address"); (b) provide VoIP360 with the accurate Service Address of the Subscriber for each TN; (c) provide each Subscriber with one or more methods of updating their Service Address, including at least one option that requires use only of the CPE necessary to access the interconnected VoIP service (any method utilized must allow Subscriber to update the Service Address at will and in a timely manner); (d) promptly provide VoIP360 with any updates to a Subscriber's Service Address; (e) obtain and keep a record of affirmative acknowledgment by every Subscriber, both new and existing, of having received and understood the advisory of the functional limitations set forth in Section 7.4; and (f) act reasonably to ensure that Subscribers do not use VoIP360 Service from a location different from the Subscriber's Service Address or where 911 is not available.

7.6 Subscriber Agreement Requirements. Customer shall ensure that, as and to the extent required by 47 C.F.R. Part 9, each of its Subscriber agreements contain, and Customer shall also ensure that each of its Resellers' agreements with Reseller's Subscribers contain, the following information: (a) a description of the functional limitations of the 911 Services as set forth in Section 7.4; and (b) a release of any and all claims against Customer (or Reseller, as the case may be) and each underlying supplier (including VoIP360 and its affiliates) arising out of the failure of 911 Services to function properly for the reasons set forth in Section 7.4. In addition, VoIP360 may notify Subscribers of the limitations on functionality from time to time in accordance with procedures mutually agreed by Customer and VoIP360

7.7 Indemnification. Customer shall indemnify and hold harmless VoIP360 against any and all damages, claims and expenses resulting from Subscriber's, Customer's or any Reseller's failure to comply with all of the requirements described in Article 7, including without limitation: (i) any failure of VoIP360 to provide 911 Service when Customer had previously opted out of receiving 911 Service (in whole or in part) in accordance with Section 7.3; (ii) with regard to the Enhanced Two-Way CCS service, any failure of VoIP360 to provide 911 Service to any person associated with a non-VoIP360 TN; and (iii) any 911 calls routed to VoIP360 as Inbound CCS or Unlimited Termination or on the wrong Trunk.

7.8 Manual Intervention. In the event a live operator or manual intervention is required to provide 911 Service to a Subscriber for any reason other than VoIP360's negligence or failure to comply with this Agreement, Customer shall be responsible for the 911 "Manual Event Fee" in Exhibit A. In addition, Customer shall be responsible for the Manual Event Fee, regardless whether manual intervention was required, as follows: (i) in the event Customer has opted-out of receiving 911 Service from VoIP360 and sends a 911 call to VoIP360; (ii) with respect to Enhanced Termination, any 911-call originating from a non-VoIP360 TN, and (ii) any 911 calls routed to VoIP360 as Inbound CCS, Unlimited Termination or on the wrong Trunk

8 CALEA

8.1 Legal Requirements. Customer acknowledges that by providing VoIP360 Service to Subscribers Customer may be obligated to comply with the Communications Assistance for Law Enforcement Act, 47 U.S.C. Sections 1001-1010 ("CALEA") and the FCC's implementing regulations, 47 C F R. Sections 1 20000-1 20008 Customer agrees and warrants that to the extent it is required to comply with CALEA any equipment, facilities or services provided by Customer related to this Agreement complies with CALEA and its implementing regulations Customer shall indemnify and hold VoIP360 harmless from any and all penalties imposed upon VoIP360 for Customer's noncompliance and shall at the sole cost and expense of Customer, modify or replace any equipment, facilities or services to ensure that such equipment, facilities and services fully comply with CALEA Customer agrees to work jointly with VoIP360 to support law enforcement agency requirements for taps, traces, court orders and all other valid law enforcement processes and procedures

8 2 Intercept Devices. When VoIP360 receives a law enforcement request associated with a Customer's Reseller or Subscriber, VoIP360 will refer such request to the Customer, unless the request directs VoIP360 to attach a pen register, trap-and-trace device or form of intercept on VoIP360's facilities, in which case, VoIP360 will comply with any such valid request.

8.3 Subpoenas. If VoIP360 receives a subpoena for information concerning a TN VoIP360 knows to be assigned to Customer's Reseller or Subscriber, VoIP360 will refer the subpoena to the requesting party with an indication that Customer is the responsible party to contact relating to the subpoena

8 4 Emergencies. If VoIP360 receives a valid request from a law enforcement agency for temporary number change, temporary disconnect, or one-way denial of outbound calls for a TN associated with a Reseller or Subscriber of Customer, to the extent such request is related to VoIP360's facilities, VoIP360 will comply with a valid emergency request. However, VoIP360 will not be liable for any claims, damages or penalties arising from compliance with such requests relating to Customer's Reseller and Subscribers and Customer agrees to indemnify and hold VoIP360 harmless against any and all such claims.

9 Customer Proprietary Network Information ("CPNI").

9.1 Acknowledgement. Customer acknowledges that rules and regulations apply to CPNI as that term is defined at 47 U.S.C. Section 222. These rules and regulations, published at 47 C.F.R. Section 64.2001 et seq., require telecommunication service providers and interconnected VoIP providers to implement specific safeguards and protect against the unauthorized disclosure of CPNI.

9 2 Warranty. Customer and VoIP360 warrant that they will implement the required safeguards and otherwise abide by the rules and regulations that apply to CPNI with regard to the services Customer purchases from VoIP360. The Parties agree that they will only use CPNI for the purpose of marketing or providing the service for which the CPNI is provided; they will not disclose CPNI to third parties unless disclosure is required to provide the service or as otherwise permitted or required by law and that they will obtain affirmative express approval from a Subscriber or Reseller before using CPNI to market new services to the Subscriber or Reseller. Customer possesses a right, and VoIP360 has a duty, under federal law, to protect the confidentiality of Customer's and its customers' CPNI. If a Party breaches this warranty or fails to comply with this Section 9, such Party (the "Indemnifying Party") shall indemnify, defend and hold harmless the other Party against any and all claims and expenses resulting from the Indemnifying Party's failure to comply with all of the requirements described in this Article 9.

9 3 CPNI Description. CPNI refers to (1) information that relates to the quantity, technical configuration, type, destination, location and amount of use of a telecommunications or interconnected VoIP service, that is made available to a carrier solely by virtue of the carrier-customer relationship and (2) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier. CPNI does not, however, include subscriber list information, which is information identifying the name, address and phone number of a customer that is published, caused to be published or accepted for publication in a directory

9 4 Permitted Uses of CPNI. VoIP360 will share this information with third parties and its affiliates as necessary to provide the requested services to Customer and otherwise as permitted or required by law. VoIP360 also may be compelled to disclose CPNI to any person upon affirmative written request by Customer.

9 5 Consent to Use CPNI. VoIP360 may use and share this information with its affiliates in order to market services to Customer, or its customers, that do not currently purchase from VoIP360 or its affiliates. Customer's approval to use CPNI to market additional services from VoIP360 or its affiliates may enhance VoIP360's ability to offer products and services tailored to Customer's or its customers' needs. A denial or approval of this request will not affect the provision of any services to which Customer currently subscribes. Customer has a continuing right to disapprove of, or withdraw its prior approval of VoIP360's use and disclosure of CPNI to allow it or its affiliates to market additional services to Customer or its customers. In addition, any approval or denial is valid until Customer affirmatively revokes or limits such approval or denial.

[END OF PAGE]

MSA NO 20080116

CityLink

VoIP360
**EXHIBIT A**
**Price List / Minimum Monthly Fee / Deposit**

Minimum Monthly Fee: $2,500.00
Term: 2 years

Ramp Period: 6 months
Deposit: $0.00

**Check All Products Which Apply**

| ☒ **Two-Way CCS (check all other features that apply)** | |
|---|---|
| ☒ 911 MRC | $0.90 per TN |
| ☒ CNAM MRC | $0 75per TN |
| TN MRC | $0.15 per TN |
| Monthly Recurring Fee per Activated TN (including CNAM and TN Fee): | $1.80 per TN |
| Non-Recurring TN Reservation Fee: | $1 00 per TN |
| Non-Recurring TN Activation Fee: | $5.00 per TN |
| Non-Recurring CCS Activation Fee: | |
| First CCS per Service Order | $50.00 per CCS |
| Each additional CCS per Service Order | $10.00 per CCS |
| Monthly Recurring CCS Fee: | $25.00 per CCS |
| **Metered Calling Rates** | |
| Outbound LD and Non-ANI rate per Minute | $0 015 |
| Canadian Outbound LD | $0.0185 |

| ☒ **Two-Way CCS (check all other features that apply)** | |
|---|---|
| ☐ 911 MRC | NA |
| ☒ CNAM MRC | $0 75 per TN |
| TN MRC | $0.15 per TN |
| Monthly Recurring Fee per Activated TN (including CNAM and TN Fee): | $0 90 per TN |
| Non-Recurring TN Reservation Fee: | $1 00 per TN |
| Non-Recurring TN Activation Fee: | $5 00 per TN |
| Non-Recurring CCS Activation Fee: | |
| First CCS per Service Order | $50.00 per CCS |
| Each additional CCS per Service Order | $10.00 per CCS |
| Monthly Recurring CCS Fee: | $25.00 per CCS |
| **Metered Calling Rates** | |
| Outbound LD and Non-ANI rate per Minute | $0.015 |
| Canadian Outbound LD | $0.0185 |

| ☒ **Unlimited Termination** | |
|---|---|
| **Metered Calling Rates** | |
| Local Termination per Minute | $0 005 |
| Enhanced Termination per Minute | $0.005 |
| Offnet LD and Non-ANI Call rate per minute | $0.015 |
| Canadian Offnet LD | $0 0185 |
| ☐ Offnet LD to be blocked and error code returned to Customer | |
| ☒ Customer shall route Enhanced Termination calls based on NPA-NXX (six digit routing) [1] | |
| ☐ Customer shall route Enhanced Termination calls based on NPA-NXX-X (seven digit routing) [2] | |
| ☐ Customer shall route Enhanced Termination calls based on NPA-NXX plus OCN [3] | |

All Non-VoIP Traffic that Customer sends to VoIP360 shall incur a Non-VoIP Traffic Surcharge of $0 02/call/minute in addition to any inter-carrier compensation charges incurred by VoIP360 for such traffic.

(1) Enhanced Termination six digit NPA-NXX list can be found on 360networks website.

(2) VoIP360 shall provide Customer a seven digit (NPA-NXX-X) Enhanced Termination routing list (Exhibit B). Customer can request in writing that VoIP360 provides an updated list, which VoIP360 shall provide within ten (10) business days.

(3) Customer shall use VoIP360's Enhanced Termination NPA-NXX list and Enhanced OCN list found on 360networks website to determine routing. Customer shall only route calls to the NPA-NXXs and OCNs provided on those lists

**The Following Fees apply to all VoIP360 Services (except as otherwise stated)**

**Directory Listing:**

| | |
|---|---|
| Non-Recurring Listed Number Fee | $7.50 |
| Non-Recurring Directory Listing Order Change Fee | $7.50 |
| Monthly Recurring Non-Published Number Fee | $3.50 |
| Monthly Recurring Non-Listed Number Fee | $3.50 |

(Monthly Recurring Fees are in addition to the Non-Recurring Listed Number Fee)

**Directory Assistance:**

| | |
|---|---|
| Per call Directory Assistance Fee | $0.55 |

**911 Fees:**

| | |
|---|---|
| 911 Manual Event Fee | $250.00 |
| 911 Address Change Fee | $3.00 |

**CNAM (on outbound calls)**

| | |
|---|---|
| Initial Fee to populate the CNAM database with end-user information | No charge |
| Change Fee per Event (includes end user change) | $3.00 |

**Expedite Fee:**

| | |
|---|---|
| NRC Expedite Fee (per Service Order) | $500.00 |

**Reconfiguration Fee:**

| | |
|---|---|
| NRC Reconfiguration Fee (per order) | $500.00 |

The first Reconfiguration Fee during any Billing Cycle shall be waived

**Local Number Portability (NRC per LNP):**

| | |
|---|---|
| Non-Recurring Port-in Fee | $8.00 |
| Non-Recurring Change Fee | $10.00 |
| Non-Recurring Cancellation Fee | $10.00 |
| Non-Recurring Port-out Fee | $0.00 |
| Non-Recurring Donating Carrier Charge | Actual Cost to VoIP360 |

**Large Volume Port-In Orders.** VoIP360 provides special rates for certain large volume Port-In Requests that meet the Special Terms applicable to the type of large volume order requested by Customer (i.e., "Bulk Order" and "Enterprise Order") and meets the General Terms applicable to both Bulk Orders and Enterprise Orders.

**Bulk Order Port-In Fee (NRC per LNP):**

| | |
|---|---|
| 200 to 999 LNPs | $7.00 |
| 1,000 to 1,999 LNPs | $3.00 |
| 2,000 or more LNPs | $1.00 |

**Special Terms – Bulk Order:**

1. Port-In Request must include a minimum of 200 TNs from a single donating carrier;
2. No less than 200 TNs per LATA
3. Customer may not group multiple donating carriers together to reach the TN requirements;
4. VoIP360 may port Bulk Order TNs on different days, in its sole discretion;

**Enterprise Order Port-In Fee (NRC):**

| | |
|---|---|
| Per Order | $100.00 |
| Per working telephone number ("WTN") and billing telephone number ("BTN") | $2.00 |

**Special Terms – Enterprise Order:**

1. All TNs must be associated with a single physical address and single billing telephone number ("BTN") on a single bill from the donating carrier to a single Subscriber;
2. A partial port of TNs is allowed, however blocks cannot be partially ported;
3. TNs do not need to be continuous;

4. The BTN is required to be ported;
5. The Port-In Request must include a minimum of fifty (50) TN's (1 BTN and 49 WTN's);
6. Enterprise Order Port-In Fees shall not apply to Ports-In Request from other VoIP providers

**General Terms applicable to both Bulk Orders and Enterprise Orders:**

1. All Port-In Request information (including all DL and LNP information) must be provided to VoIP360 at one time, in a format acceptable to VoIP360 and must be accurate and complete at that time; if any information provided by Customer is incorrect and requires VoIP360 to manually intervene after accepting the Port-In Request, Customer shall be liable for an additional charge of $10.00 per affected TN;
2. All TN's in the Port-In Request must be in an Offered Rate Center at the time of the Port-In Request
3. The Standard Non-Recurring Port-In Fee shall not apply to Bulk Orders or Enterprise Orders, however, all other NRCs and MRCs shall apply in accordance with the Customers MSA, including without limitation Change Fees, Cancellation Fees, Port-Out Fees, Directory Listing, 911, CNAM, TN Fee, and Directory Assistance;
4. Due to the size of Bulk and Enterprise Orders, VoIP360 target completion of ten (10) business days will not apply;
5. VoIP360 may, in its sole discretion, require payment of all Fees for Bulk and Enterprise Order in advance (once the order is complete, any credits or additional charges will be reflected in Customer's next invoice);
6. VoIP360 may, in its sole and absolute discretion, reject Bulk and Enterprise Orders.
7. All of the DL information associated with the Port-In Request must be provided by Customer for each DL Request, including how the Primary Listing is to be displayed;
8. The Fee schedule listed above is based on Port-In Requests that are completed;
9. DLs may be initiated up to 40 calendar days after the Port-In is complete;
10. Activations of ported TNs on the FOC (Firm Order Commitment) date will be scheduled at 11:00 am and 3:00 pm MST;
11. All Bulk or Enterprise Orders shall be sent to the Client Services Manager assigned to the Customer and not placed through VoIP360's online order entry portal

NOTE: ALL SERVICES AND FEES DESCRIBED IN THIS EXHIBIT A ARE FURTHER DESCRIBED AND SUBJECT TO THE MASTER SERVICES AGREEMENT, MASTER TERMS AND CONDITIONS AND SERVICE SCHEDULE. PRICING ABOVE DOES NOT INCLUDE FEES FOR SERVICES TO CONNECT TO VOIP360'S FACILITIES (I E., IP CONNECTIVITY, PRIVATE LINE, LOCAL LOOP, CO-LOCATION, AND CROSS-CONNECT, ETC), OR ANY TOLL USAGE, TAXES, AND FEDERAL, STATE OR LOCAL SURCHARGES.

**[END OF PAGE]**

**Attachment 1**
**Alternate 911 Service Acknowledgement Form**

☐ Total Opt-Out (911 Service will NOT be available for on *any* Services or Activated TNs )

☒ Partial Opt-Out (911 Service will NOT be available for *certain* Services or Activated TNs identified by Customer and routed over certain Trunks by Customer. Customer acknowledges and agrees that it must order a dedicated Trunk for the calls from Activated TNs that include 911 Service and a separate Trunk for the calls that do not include 911 Service.)

1. Customer acknowledges and agrees that to the extent that it is a provider of Interconnected VoIP service as that term is defined in 47 C.F.R. § 9.3, it may be subject to the obligations placed upon providers of Interconnected VoIP service set forth in 47 C.F.R. Part 9

2. Customer acknowledges and agrees that VoIP360 has offered to provide and is willing and able to provide connectivity to link 911 calls from Customers' Subscribers to the associated PSAPs or default answering point for such Subscribers

3. With respect to Customers that have selected **Total Opt-Out**, Customer represents and warrants that: (a) Customer has made arrangements with a third party provider of 911 connectivity so that Customer's Subscribers' calls to 911 are properly routed to the appropriate PSAPs or default answering points; (b) Customer will not send any 911 calls to VoIP360 for processing, delivery, or completion, and; (c) Customer is in compliance with 47 C.F.R. Part 9 and that it will remain in compliance for the term of the Agreement. ***Customer acknowledges and agrees that it is solely responsible for proper handling and termination of 911 calls and therefore "opts-out" of VoIP360's provision of connectivity for 911 calls***

4. With respect to Customers that have selected **Partial Opt-Out**, Customer represents and warrants as follows:

   (i) with respect to those certain Services and Activated TNs which Customer has chosen that VoIP360 NOT provide 911 Service: (a) Customer has made arrangements with a third party provider of 911 connectivity so that Customer's Subscribers' calls to 911 are properly routed to the appropriate PSAPs or default answering points; (b) Customer will not send any such 911 calls to VoIP360 for processing, delivery, or completion; (c) Customer is in compliance with 47 C.F.R. Part 9 and that it will remain in compliance for the term of the Agreement.

   (ii) with respect to those certain Activated TNs which Customer has chosen that VoIP360 provide 911 Service: (a) Customer agrees that all of the terms and conditions of the MSA shall apply to such TNs, including without limitation, Article 7 and (b) Customer shall be solely responsible to route all calls from such TNs over Customer's Trunk that is 911-enabled and not to route any calls from such TNs over Customer's Trunk that is not 911-enabled.

5. To the extent that, by virtue of erroneous routing or any other reason, 911 calls from Customer's Subscribers are directed to VoIP360, Customer agrees that it will take all steps necessary on an emergency basis to correct the situation immediately and shall be responsible for all fees, costs and expenses associated with the routing of such call.

6. The name and contact number for the entity that Customer will use to provide 911 connectivity is stated below:

   Customer certifies that the use of VoIP360 provider Non 911 trunk doesNot require 911 service, therfore alt 911 provider is not necessory

By its authorized signature below, Customer agrees to the foregoing and represents that the information contained in Section 6 is accurate and complete.

CityLink Fiber Holdings, Inc.

By: [signature]

Printed Name: John Broad

Title: President

Date: 18-Feb-09

SERVICE LEVEL AGREEMENT

This Service Level Agreement ("SLA") sets forth the service availability standards for VoIP360 Services provided by VoIP360 to Customer. In the event VoIP360 fails to meet the service availability standards, the Customer may, subject to certain conditions and exclusions, be entitled to certain credits against its monthly recurring charges in accordance with this SLA.

1. Definitions. As used in this SLA, the capitalized terms listed in this Section 1 and derivatives thereof shall have the meanings respectively ascribed to them in this Section 1. Certain other capitalized terms shall have the meanings ascribed to them elsewhere in the Agreement. "Outage Credit" shall mean a certain percentage of the MRC that Customer is not obligated to pay for a Service to the extent such Service is affected by an Outage; "Jitter" is the variation in Latency between consecutive IP packets; "Latency" or network delay means the time it takes for an IP packet to go from the entry point on the VoIP360 Platform to the exit point off the VoIP360 Platform as measured in milliseconds (ms); "Monthly Recurring Charge" (or "MRC") means the recurring charge incurred each month for a certain Service. "Off-Net Service" means a Service (or that portion of a Service) provided by VoIP360 for Customer that utilizes network facilities or equipment *not* owned and controlled by VoIP360; "On-Net Service" means a Service (or portion of a Service) provided by VoIP360 on the VoIP360 Platform; "Outage" shall mean a failure of Customer's Service to meet the Packet, Latency or Jitter Objectives; "Packet Delivery" shall mean the percentage of packets that enter and exit the VoIP360 Platform without being lost in a calendar month and only applies to packets supporting Service to Customer; "Sites" means the locations where the Customer's packets enter and exit the VoIP360 Platform; "Third Party" means a party providing services other than VoIP360 or Affiliates; "VoIP360 Platform" shall mean the network facilities or equipment owned and controlled by VoIP360 to provide the VoIP360 Service

2. Service Installation Interval. The objective for installing new TNs and CCSs is five (5) business days and for Ported TNs it is ten (10) business days. For all other VoIP360 Services, VoIP360 shall use commercially reasonable efforts to install such Services on or before the date requested by Customer and confirmed by VoIP360. The foregoing are targets only and failure to meet such targets shall not entitle Customer to Outage Credits or constitute a default under the Agreement

3 Service Performance

3.1 Packet Delivery. The Packet Delivery performance objective is 99.75% averaged over a calendar month between Sites within the VoIP360 Platform ("Packet Objective"). Packet loss due to Exclusions or Off-Net Services is not included in the Packet Delivery measurement. In the event VoIP360 does not meet the Packet Objective with respect to Customer's Service, Customer may, subject to Section 4, be entitled to receive an Outage Credit associated with the affected Service for that particular month as follows:

| *Packet Delivery* | *Outage Credit* |
|---|---|
| 99.5 – 99.74% | 5% |
| 99 – 99.49% | 10% |
| 98 – 98.99% | 15% |
| 97 – 97.99% | 25% |
| 96 – 96.99% | 50% |
| 95.99% or less | 100% |

3 2 Latency. The Latency performance objective is 40 ms (one-way) and 70 ms (round-trip) averaged over a calendar month between Sites within the VoIP360 Platform ("Latency Objective"). Latency due to Exclusions or Off-Net Services is not included in the Latency measurement In the event VoIP360 does not meet the Latency Objective with respect to Customer's Service, Customer may, subject to Section 4, be entitled to receive an Outage Credit associated with the affected Service for that particular month as follows:

| *Latency in excess of 40ms (one way) or 70ms (round trip)* | *Outage Credit* |
|---|---|
| 0.1 – 5 ms | 5% |
| 5.1 – 10 ms | 10% |
| 10.1 – 15 ms | 15% |
| 15.1 – 20 ms | 25% |
| 20.1 – 25 ms | 50% |
| 25.1 ms or greater | 100% |

3.3 Jitter The Jitter performance objective is 2ms averaged over a calendar month between Sites within the VoIP360 Platform ("Jitter Objective"). Jitter due to Exclusions or Off-Net Services are not included in the Jitter measurement. In the event VoIP360 does not meet the Jitter Objective with respect to Customer's Service, Customer may, subject to Section 4, be entitled to receive an Outage Credit associated with the affected Service for that particular month as follows:

| *Jitter in excess of Jitter Objective (2ms)* | *Outage Credit* |
|---|---|
| 0.1 – 1 ms | 5% |
| 1.1 – 2 ms | 10% |
| 2.1 - 3 ms | 15% |
| 3.1 - 4 ms | 25% |
| 4.1 – 5 ms | 50% |
| over 5 ms | 100% |

4 Outage Credit Request. In order to be eligible for an Outage Credit, Customer must: (i) Open a trouble ticket with VoIP360 in accordance with VoIP360 standard procedures within five (5) days of Customer's Service being affected by Packet Delivery, Latency or Jitter below the performance objective; (ii) file a claim in writing (or via fax or email) with Customer's client services manager or

customer service within fifteen (15) business days of the end of the month of the asserted Outage for the affected Service ("Outage Request") The Outage Request must contain the following information: Customer name, contact information, date of the Outage, the trouble ticket number, and the Outage Credit requested. If the Outage Request is rejected, Customer shall be notified of the reason for rejection; if it is accepted, the Outage Credit will be credited on Customer's next invoice Outage Credits only apply to the Service affected by the Outage. In the event Customer has not timely complied with this Section, VoIP360 shall not be obligated to provide any Outage Credits. Outage Credits shall only be available to the extent Customer's Service is affected by an Outage

5. Exclusions / Limitations. Outage Credits shall not be provided for Outages due to: (i) Customer or its agents, (ii) Customer equipment, (iii) Third Parties, (iv) Force Majeure Events, (v) Scheduled Maintenance (defined below), (vi) Emergency Maintenance (defined below), (vii) interruptions prior to the Acceptance Date, (viii) VoIP360's inability to access or utilize any property or equipment not owned or controlled by VoIP360, (ix) Off-Net Services or equipment, (x) the customers local area network (LAN), (xi) failure of any components outside the VoIP360 Platform, (xii) interconnections to or from the connectivity with other Internet Services Providers (ISPs) networks, (xiii) traffic exchange points which are controlled by Third Parties, (xiv) any other cause other than an On-Net Outage caused by failure of network facilities or equipment owned and controlled by VoIP360 (collectively "Exclusions") The duration of an Outage may not be aggregated with any other Outage. Outage Credits in a month shall not exceed one hundred percent (100%) of the MRC of the affected Service and may not be carried over from month to month. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, OUTAGE CREDITS SHALL BE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF ANY OUTAGES.

6. Scheduled Maintenance: VoIP360 may, upon two (2) business days' notice, suspend the provision of all or any of the Services to the Customer during the Maintenance Window (defined below), in order to maintain, test or configure the Services, to upgrade hardware or software, increase capacity or to perform such other non-emergency work as VoIP360 may determine is necessary or appropriate ("Scheduled Maintenance"). The Maintenance Window means 12:00 a.m. to 6:00 a.m (local time) and certain scheduled weekends, as required (the "Maintenance Window") Scheduled Maintenance may degrade the quality of Services or cause an Outage.

7. Emergency Maintenance: VoIP360 may, without notice, perform work at any time to correct, replace or repair network conditions which are likely to cause an Outage, and which require immediate correction ("Emergency Maintenance"). Emergency Maintenance while being conducted, may degrade the quality of the Services or cause an Outage.

8. Chronic Outages. In the event a Service Order incurs three (3) unrelated Service Outages in excess of fifteen (15) minutes in a single month ("Chronic Outage"), VoIP360 will, at the Customers request, re-provision the Service In addition, in the event of two Chronic Outages of the same Service Order in a twelve (12) month period, Customer may terminate the Service Order without penalty or further liability by written notice to the Network Operations Center or Customer Care Center within five (5) business days of the outage. Such termination will be effective sixty (60) days after receipt of written notice to VoIP360. Such termination shall be Customer's sole and exclusive remedy and Customer shall not be entitled to any Outage Credits.

**[END OF PAGE]**